624 So.2d 107 (1993)
OPINION OF THE JUSTICES.
No. 338.
Supreme Court of Alabama.
April 27, 1993.
Members of the Senate
Alabama State House
Montgomery, Alabama 36130
Dear Senators:
We have received Senate Resolution 97, which requests our opinion as to whether the finding in Section One of Senate Bill 607 ("S. 607") (the finding that the Legislature is required to provide schoolchildren with substantially equitable and adequate educational opportunities) is constitutionally required. Section One of S. 607 reads as follows:
"Section 1. The Legislature finds that it is constitutionally required to comply with the order of the circuit court in the consolidated cases of Alabama Coalition for Equity, Inc. v. Hunt, CV-90-883-R, and Harper v. Hunt, CV-91-117-R, to wit:
"`1. That, pursuant to Ala. Const. Art I, §§ 1, 6, 13 and 22 and Art. XIV, § 256, Alabama schoolage children, including children with disabilities, have and enjoy a constitutional right to attend school in a liberal system of public schools, established, organized, and maintained by the state, which shall provide all such schoolchildren with substantially equitable and adequate educational opportunities.
"`2. That the essential principles and features of the "liberal system of public schools" required by the Alabama Constitution include the following:
"`a. It is the responsibility of the state to establish, organize, and maintain the system of public schools.
"`b. The system of public schools shall extend throughout the state.
"`c. The public schools must be free and open to all schoolchildren on equal terms.
"`d. Equitable and adequate educational opportunities shall be provided to all schoolchildren regardless of the wealth of the communities in which the schoolchildren reside.
"`e. Adequate educational opportunities shall consist of, at a minimum, an education that provides students with opportunity to attain the following:
"`(i) Sufficient oral and written communication skills to function in Alabama, and at the national and international levels, in the coming years.

*108 "`(ii) Sufficient mathematic and scientific skills to function in Alabama and at the national and international levels, in the coming years.
"`(iii) Sufficient knowledge of economic, social, and political systems generally, and of the history, politics, and social structure of Alabama and the United States, specifically, to enable the student to make informed choices.
"`(iv) Sufficient understanding of governmental processes and of basic civic institutions to enable the student to understand and contribute to the issues that affect his or her community, state, and nation.
"`(v) Sufficient self-knowledge and knowledge of principles of health and mental hygiene to enable the student to monitor and contribute to his or her own physical and mental well-being.
"`(vi) Sufficient understanding of the arts to enable each student to appreciate his or her cultural heritage and the cultural heritages of others.
"`(vii) Sufficient training, or preparation for advanced training, in academic or vocational skills, and sufficient guidance, to enable each child to choose and pursue life work intelligently.
"`(viii) Sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in Alabama, in surrounding states, across the nation, and throughout the world, in academics or in the job market.
"`(ix) Sufficient support and guidance so that every student feels a sense of self-worth and ability to achieve, and so that every student is encouraged to live up to his or her full human potential.
"`3. That pursuant to Ala. Code §§ 16-39-3 and 16-39A-2, Alabama schoolchildren with disabilities aged 3-21 have the right to appropriate instruction and special services.
"`4. That the present system of public schools in Alabama violates the aforestated constitutional and statutory rights of plaintiffs.
"`5. That the state officers charged by law with responsibility for the Alabama public school system, are hereby enjoined to establish, organize, and maintain a system of public schools that provides equitable and adequate educational opportunities to all school-age children, including children with disabilities, throughout the state in accordance with the constitutional mandates of Ala. Const. Art. XIV, § 256; Art. I, §§ 1, 6, and 22; and to provide appropriate instruction and special services to children with disabilities aged three through twenty-one pursuant to Ala. Code §§ 16-39-3 and 16-39A-2.'"
As stated above, S. 607 was introduced in response to the finding of the Circuit Court of Montgomery County in the consolidated cases of Alabama Coalition for Equity, Inc. v. Hunt (CV-90-883) and Harper v. Hunt (CV-91-117). For a better understanding of the question presented and in view of the fact that S. 607 makes reference to the order, we directed the clerk of this court to obtain a certified copy of the order issued in the consolidated cases. See Rule 10(f), Ala. R.App.P.; Amendment 328, §§ 6.02, 6.11, Ala. Constitution of 1901. In your request you refer to this order, which is attached as an appendix to, and made a part of, this opinion. This order is not presently appealable, because the trial court has retained jurisdiction in order to address other aspects of this litigation. However, the trial court has, in an exhaustive opinion, addressed the constitutional issues that were raised in that court and that are the subject of your request for an advisory opinion.
The Justices typically refuse to answer questions involving matters that are the subject of pending litigation. The question posed by Senate Resolution 97, however, is of great importance to the people of the State of Alabama and to the Legislature, and your request for an Advisory Opinion indicates that you are interested in promptly addressing the matters required to be addressed by the order of the circuit court in the two consolidated cases.
Because the legal issues presented in those cases could be raised on appeal, provided an *109 appeal should be taken within the time provided for by Rule 4, Ala.R.App.P., we deem it both appropriate and advisable that we call your attention to some of the principles of law that govern us as we respond to your inquiry.
The statute authorizing the Justices of this Court to render advisory opinions, but not requiring them to do so, was enacted into law in 1923, and is carried in the 1975 Alabama Code as § 12-2-10. When the first request for an advisory opinion was made to the Justices in 1923, a majority of them found that the original act was constitutional, but the Justices set forth the following principles that guided them, and continue to guide us, when we express our individual opinions as authorized by the Advisory Opinion Act:
"(1) Interpreting the act according to its manifest effects, these conclusions must, of necessity prevail: (a) That the act does not at all contemplate the advice or the advisory opinions of the Justices upon any matter relating to the wisdom, desirability, or policy of prospective legislative or executive action; (b) that the merely advisory opinions contemplated are those of the individual Justices, not of the Supreme Court of Alabama in its judicial capacity; (c) that specific inquiries, within the intent of the act, must involve or concern concrete, important constitutional questions upon matters or subjects of a general public nature, as distinguished from questions involved in the ascertainment or declaration of private right or interest; (d) and that responses to questions within the purview of the act are designed to be advisory, consultative only, not concluding or binding the Governor or the House or Houses propounding inquiries or the Justices responding thereto."
Opinion of the Justices No. 1, 209 Ala. 593, 594, 96 So. 487 (1923).
Since the Justices issued their opinions on that first request, the Justices have responded conscientiously to many requests from the Legislature, "in deference to the executive and legislative departments of the state in order to guide them in the proper dispatch of their duties." Opinion of the Justices No. 160, 266 Ala. 370, 371, 96 So.2d 752, 753 (1957). See also, Opinion of the Justices No. 274, 394 So.2d 957, 959-60 (Ala.1981).
Because the question you pose is one of great public interest, and because the question raises a question of fundamental constitutional law relating to the separation of powers of government, we elect to express our opinion on the question you ask, but we must point out, as we did on another occasion when the Legislature asked for the opinion of the Justices on the constitutionality of pending legislation while the basic constitutionality of the same Act was being raised on appeal in an adversary setting: "[T]he procedure, as well as the advisability, of rendering advisory opinions is not without difficulty, particularly in view of the fact that the questions are presented outside the normal adversary system wherein pertinent facts from the record of a trial court would be presented, and the issues would be briefed by attorneys and most times orally argued before the Court." Opinion of the Justices No. 289, 410 So.2d 388 at pages 391-92 (Ala.1982).
As the Justices said in Opinion No. 289, when they were asked to express their separate opinions on the constitutionality of the budget isolation bill, while the constitutionality of the legislation was being raised in a case on appeal, "It is also instructive to note that advisory opinions are not binding precedents as are decisions on appeal to this Court." 410 So.2d at 392.
With those principles firmly in our minds, we now express our opinion on your request, that is, whether the Legislature is required to comply with the order of the circuit court in the consolidated cases. Our opinion is that the order has the force of law unless modified by the trial court, until it is modified or reversed on appeal, and the Legislature, like other branches of government, must comply with it.
Under our State constitution, "[t]he powers of the government of the State of Alabama [are] divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Art. III, § 42.
*110 The executive and legislative branches of the State have broad powers and responsibilities in the area of public education, but the powers of each branch of government are bounded by the mandates and restraints of the constitution of the State of Alabama. This principle of separation of powers of government that is now included in the Alabama constitution was first decided in the famous case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-77, 2 L.Ed. 60 (1803). It is the province and duty of the judicial branch of government to interpret the constitution and to say what the law is, and an order issued by a court of competent jurisdiction that interprets the constitution is binding upon the Legislature unless the order is stayed or overturned by a higher court.
Under the provisions of Amendment 328, Section 6.04, "[t]he circuit court shall exercise general jurisdiction in all cases except as may otherwise be provided by law." Included within the general jurisdiction of the circuit court is the power to decide whether the actions of the executive or legislative branches are consistent with the requirements of the fundamental law of the peopletheir constitution. In short, the circuit court has the power, and indeed the duty, when requested to do so in cases involving justiciable controversies, to interpret the constitution, and its interpretation, unless changed by a competent court having the power to overturn it, must be accepted and followed. See, 21 C.J.S. Courts § 3, pp. 11-12 (1940).
Your inquiry, as we understand it, is whether the Legislature is required to follow the order of the Circuit Court of Montgomery County in the consolidated cases referenced above. Our answer, based upon the principles set out herein, is yes.
 Respectfully submitted,
 SONNY HORNSBY
 Chief Justice
 HUGH MADDOX
 RENEAU P. ALMON
 JANIE L. SHORES
 OSCAR W. ADAMS, Jr.
 GORMAN HOUSTON
 HENRY B. STEAGALL, II
 KENNETH F. INGRAM
 Justices

APPENDIX

In the Circuit Court for Montgomery County, Alabama

ALABAMA COALITION FOR EQUITY, INC., AN ALABAMA NONPROFIT CORPORATION, et al. Plaintiffs,

vs.

GUY HUNT in his official capacity as Governor of the State of Alabama and as President of the State Board of Education, et al. Defendants.

MARY HARPER, suing as next friend of DEION HARPER and KERRY PHILLIPS, minors; et al., Plaintiffs,

vs.

GUY HUNT, in his official capacity as Governor of the State of Alabama and as President of the State Board of Education; et al., Defendants.

Civ. A. Nos. CV-90-883-R, CV-91-0117.

Filed April 1, 1993.

ORDER
Plaintiffs in this action challenge the constitutionality of Alabama's system of public elementary and secondary education, which they contend does not offer equitable and adequate educational opportunities to the schoolchildren of the state, including children with disabilities. They seek declaratory and injunctive relief from the constitutional and statutory violations alleged. Defendants deny that the public school system is unlawful and deny further that this Court is the proper forum for resolution of this dispute.
Pursuant to the findings of fact and conclusions of law which follow, the Court finds and determines that the plaintiffs are entitled to a declaratory judgment that the present system of public schools in Alabama violates the constitutional mandate of art. XIV, § 256, and the provisions of art. I §§ 1, 6, 13 and 22 of the Alabama Constitution, because the *111 system of public schools fails to provide equitable and adequate educational opportunities to all schoolchildren and, with respect to children with disabilities ages three through 21, fails to provide appropriate instruction and special services in violation of Ala.Code (1975) §§ 16-39-3 and 16-39A-2 (hereinafter "Ala. Code").

PROCEDURAL HISTORY
These consolidated lawsuits were brought on behalf of schoolchildren, parents, and school systems throughout the state of Alabama. Plaintiff Alabama Coalition for Equity, Inc. (ACE), an Alabama non-profit corporation comprised of 25 school systems[1] and a number of individual parents and schoolchildren, filed its complaint on May 3, 1990 (CV-90-883). Plaintiffs Mary Harper, et al. (Harper plaintiffs), a group of public schoolchildren, filed their complaint on January 19, 1991 (CV-91-117). By order dated March 18, 1991, the Court[2] consolidated these cases. Subsequently, on April 21, 1992, the Court certified a statewide class in the Harper action of all children who are presently enrolled or will be enrolled in public schools in Alabama that provide less than a minimally adequate education.
John Doe, a disabled student, moved to intervene as a plaintiff in the ACE lawsuit on August 3, 1990, and the Court granted this motion on January 9, 1991. On July 24, 1992, the Court certified a plaintiff sub-class of all schoolchildren in Alabama aged three through 21 years with identified disabilities.
Plaintiffs in these consolidated actions named as defendants Governor Guy Hunt, State Director of Finance Robin Swift, Lieutenant Governor James Folsom, Speaker of the House of Representatives James Clark, State Superintendent of Education Wayne Teague, and the members of the Alabama State Board of Education. However, the speaker of the Alabama House of Representatives, the Lieutenant Governor, the State Superintendent of Education and all members of the State Board of Education moved in May and June, 1990, to realign as plaintiffs, indicating that they agreed with plaintiffs' claims. The Court granted these motions.
The Mountain Brook, Vestavia Hills, Hoover, Madison, and Huntsville school systems filed petitions to intervene in this action. On January 9, 1991, the Court denied their motions to intervene, but granted them permission to submit amicus briefs, and to resubmit their petitions to intervene at a later date. The Alabama Association of School Boards and the Mobile and Decatur school systems were granted permission to appear as amicus curiae. Shortly before trial, the Mountain Brook, Hoover, Homewood and Shelby County school systems filed a motion to appear as amicus curiae on behalf of plaintiffs. A +, an organization dedicated to reforming and improving public education, filed an application for permission to file a brief supporting plaintiffs as amicus. The Court granted these motions.
On January 22, 1991, plaintiffs moved for partial summary judgment on their claim that § 256 of Amendment 111 of the Alabama constitution was enacted in violation of the fourteenth amendment to the United States constitution. The Court granted plaintiffs' motion by order dated August 13, 1991. In its order, this Court declared that Amendment 111, § 256 was void ab initio in its entirety. The Court declared in the same order that § 256 of the Alabama constitution is in effect to the extent that it provides: "The legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years." The Court further held that the second and third sentences of § 256 of the Alabama constitution are without *112 force and effect because they violate the equal protection guarantee of the fourteenth amendment. This order was subsequently certified as a final order, and was not appealed by defendant.[3]
The Court has bifurcated the non-jury trial of this case[4] into liability and remedy phases. Trial in the liability phase began on August 3, 1992 and concluded on August 27, 1992. Plaintiffs presented evidence in the form of live testimony from many expert and lay witnesses, depositions from several other witnesses including that of Governor Hunt, responses to requests for admissions from Governor Hunt, affidavit testimony from additional witnesses, and numerous exhibits. Governor Hunt offered testimony from three expert witnesses as well as a number of exhibits. The parties have filed pre-trial, post-trial and post-trial reply briefs.

ISSUES PRESENTED
The issues now before the Court for resolution may be summarized generally as follows. The ACE and Harper plaintiffs claim that the educational opportunities[5] provided to schoolchildren[6] in Alabama's system of public elementary and secondary schools are: (1) inequitable, because such opportunities vary widely from system to system without constitutionally sufficient justification; and (2) inadequate by virtually any measure of educational adequacy, including the state's own standards and other professionally recognized measures of adequacy. Plaintiffs emphasize, as a factual matter, that the disparities and inadequacies of which they complain are substantial, meaningful and, in many cases, profound. Plaintiffs argue that these educational conditions, however caused, are the responsibility of the state government; that these conditions violate their rights under Ala.Const. art. XIV, § 256 (the state's education clause), Ala.Const. art. I, §§ 1, 6, 13 and 22 (the state equal protection and due process clauses), and the United States Constitution, amend. 14 (the federal equal protection and due process clauses); and that this Court is the proper forum in which plaintiffs' constitutional rights should be declared and vindicated.
The John Doe plaintiffs join the other plaintiffs in their claims and assert two additional claims limited to children with disabilities. The sub-class of schoolchildren with disabilities argues that such children have a right to an "appropriate education and special services" under Ala.Code §§ 16-39-3 (1975) and 16-39A-2. The Doe plaintiffs claim that they are deprived of this right by the state system of special education. The sub-class also asserts a separate claim under Ala.Const. art. 1 §§ 6, 13 (the due process clause), arguing that the mechanism for distributing special education funds based on total pupil enrollment is arbitrary and irrational and results in the denial of an appropriate education to schoolchildren with disabilities.
In response to the ACE and Harper plaintiffs, Governor Hunt admits that "poor physical conditions, inadequate curriculum, insufficient textbooks and inadequate educational services" are present in the state school system, Hunt Pre-Trial Brief at 2, although he maintains that these are isolated cases, which are the result of local taxing choices or local school mismanagement. As to funding disparities among local school systems, Governor *113 Hunt argues that these are not sufficiently large to be deemed inequitable, especially when compared with disparities in some other states. Governor Hunt maintains that, in any case, the conditions of which plaintiffs complain are not unconstitutional, and that the equity or adequacy of public schooling in Alabama is entirely a matter of legislative discretion, to which this Court must defer.[7]
Governor Hunt, in response to the Doe plaintiffs, presented no facts to contradict claims that schoolchildren with disabilities do not receive an appropriate education or that funding is inequitable. He did, however, claim that the failure to provide an appropriate education to individual students does not imply a systemic failure. Hunt Pre-Trial Brief at 33.

THE STATE PUBLIC SCHOOL SYSTEM
The state of Alabama has 129 local school systems, 67 of which are county systems and 62 of which are independent city systems. Student enrollment in these systems ranges in size from 65,956 students in Mobile County to 210 in Florala City; the average enrollment for all systems is 5,530 students. In the 1990-91 school year, total enrollment in Alabama's public schools for kindergarten through twelfth grade (K-12) was 713,909, with an average daily attendance (ADA) of 682,937 students. Attendance at public school or a lawful substitute is compulsory, and truancy is punishable by fines and jail time for persons having charge of any student required to attend school. Ala.Code §§ 16-28-1 et seq. Each of the state's 129 local school systems serves children with disabilities in 13 categories of disability. In the 1991-1992 school year, there were 97,937 of these special needs children enrolled in schools in Alabama.
Public officials at both the state and local levels administer Alabama's public schools. The state legislature from time to time enacts measures directly mandating certain programs and standards in public schools. See, e.g., id. at §§ 16-3-18.4 (performance-based on accreditation), 16-36-34 (textbooks), 16-8-43 (school restrooms). The State Board of Education, which consists of eight members elected statewide, id. at § 16-3-1, exercises "general control and supervision over the public schools of this state." Id. at § 16-3-11; see also Ala.Const. amend. 284. The Board is charged with investigating the educational needs of the state, adopting regulations relating to grading and standardizing schools, courses of study, teacher training and certification, and other aspects of the administration of public schools. Id. at §§ 16-3-12, 16-3-14, 16-13-15, 16-3-16, 16-3-17.
The governor of Alabama is president and an ex officio member of the State Board of Education. Id. at §§ 16-3-1, 16-3-2. Governor Hunt maintains a full-time education advisor on his executive staff. More generally, the governor holds the supreme executive power in the state, Ala.Const. art. V, § 113, and is responsible for seeing that the laws are faithfully executed. Id., art. V, § 120.
The state superintendent of education, with the advice and counsel of the State Board of Education, is in charge of the on-going operation of Alabama's department of education. Ala.Code § 16-2-1. The state superintendent is charged with executing the educational policy of the Board, id. at § 16-4-6, and has the duty "to explain the true intent and meaning of the school laws and of the rules and regulations of the state board of education." Id. at § 16-4-4. Among other responsibilities, the state superintendent must prepare and submit for approval to the Board rules and regulations for grading and standardizing public schools, minimum requirements for diplomas and courses of study, and legislation needed for the further development and improvement of the public schools. Id. at §§ 16-3-15, 16-4-14, 16-4-20.
In the area of special education, Alabama statutes require that all children with disabilities *114 receive an appropriate education and that the state board adopt regulations ensuring such an education. Ala.Code §§ 16-39-3 and 16-39-5.
At the local level, public schools are governed through county and city boards of education. Local boards of education are responsible for the general administration and supervision of the public schools within their respective jurisdictions. Id. at §§ 16-8-8, 16-11-9. These boards establish local educational policies, id. at §§ 16-8-10, 16-11-18, employ administrative, teaching and support personnel for their school systems, id. at §§ 16-8-23, 16-11-17, and perform such other duties and functions as required by law.
The public school budget process also operates at several levels. Local school boards receive a mixture of state, local and federal funds to finance public schools and related programs within their respective school systems. Local funds are primarily raised through ad valorem (property), sales, and other taxes levied under constitutional or statutory authority. These funds are apportioned and expended by local school boards within the school systems in which the funds are raised. Id. at § 16-13-32. Federal funds are allocated by federal authorities directly to the State Department of Education, and distributed by that body to local school boards according to federal mandates.
Funds from state revenues are appropriated for local school boards at the state level. Each county and city board of education submits an annual budget to the state superintendent. Id. at § 16-13-140(b). The state superintendent exercises independent judgment in preparing a state-wide education budget request to offer to the Board, id. at § 16-4-19, which in turn forwards its recommended school budget to the governor. The governor is charged with "formulat[ing] the program and financial plan to be recommended to the legislature" for state government as a whole at his or her own discretion after review of each state agency's proposed budget, including the public school budget. Id. at §§ 41-19-4, 41-19-7.
The department of finance assists the governor in preparing this budget plan, id. at § 41-19-5(1), and administers and implements the budget. Id. at §§ 41-19-5(4), 41-19-10(c) and (f). The legislature considers the plan recommended by the governor and adopts this budget or alternative proposals as it deems appropriate. Id. at § 41-19-8. Budgeted state revenues are allocated to local school boards by a number of methods described more specifically below, as set out in a variety of state laws and regulations. See, e.g., id. at §§ 16-13-1 et seq.
With this background in mind, the Court will first address the ACE and Harper[8] plaintiffs' general factual allegations concerning the operation and effects of the Alabama public school system, and then the Doe plaintiffs' more specific allegations regarding the education of children with disabilities within the state, as well as defendant's responses.

EQUAL EDUCATIONAL OPPORTUNITY
The ACE and Harper plaintiffs (hereinafter, plaintiffs) contend that, as a factual matter, Alabama schoolchildren do not receive substantially equal (or equitable) educational opportunities in the state's public schools. The Court agrees.
The Court understands the term "educational opportunities" to mean, in the broadest sense, the educational facilities, programs and services provided for students in Alabama's public schools, grades K-12, and the opportunity to benefit from those facilities, programs and services.[9] "Equal" educational opportunities need not necessarily be strictly equal or precisely uniform, whether these opportunities are discussed in terms of school funding, of the programs purchased with such funds, or of the actual educational benefits offered. "Equality of benefit does not import identity of benefit, which is obviously *115 impracticable." Southern Railway Company v. St. Clair County, [124 Ala. 491] 27 So. 23, 27 (1899). For example, as testimony at trial indicated, schoolchildren who have different educational circumstances, needs and aptitudes may require different school resources and facilities which, in turn, may entail different costs. This may be most obvious in the case of children with disabilities and children otherwise disadvantaged.
Thus, the Court, in reviewing the evidence, has focused its inquiry broadly on the issue of substantial equity and fairness in the way the state's system of public schools allocates educational opportunity to its students. In this area, the Court finds that Alabama's public school system falls dramatically short.
Although equal educational opportunity cannot be measured exclusively in terms of public school funding, there is no question that educational facilities, programs and servicesfrom field trips to computerscost money to provide, so disparities in school funding must play a major role in the Court's analysis. Indeed, the state of Alabama has itself historically linked equitable school funding to equal educational opportunity. Prominent twentieth century examples are the so-called Equalization Fund of 1927 and its successor, the Minimum Program Fund of 1935 (still in effect, though ineffective, today), which sought to equalize educational opportunity. See Ala.Code §§ 16-13-50, et seq. Accordingly, it is appropriate to begin an analysis of equal educational opportunity in Alabama's public schools by examining the issue of equity in school funding.
Plaintiffs offered trial testimony from a number of nationally prominent school finance experts which indicated that, by virtually any measure, schoolchildren in wealthier school systems in Alabama are allocated considerably more funding per pupil than are children in poorer school systems. For example, the Mountain Brook city school system, which ranked highest in state and local revenues of Alabama's 129 school systems in the 1989-90 school year, had $4,820 available in state and local revenues to spend per pupilmore than double the resources available to the Roanoke city schools, the lowest revenue system, which had only $2,371 per pupil. This disparity of $2,449 (more than 2 to 1) per pupil represented a difference in revenues of $61,225 per classroom of 25 students in a single year. Disparities of this kind in revenues were also reflected in disparities in expenditures.
Governor Hunt argues that it is misleading to assess school funding disparities by looking at the gap between the top and bottom systems. He maintains that a small number of wealthier systems, which he calls "outliers," far outstrip the other systems in revenues and expenditures, and that these less typical systems somehow skew or bias the analysis. The Court disagrees for several reasons. First, children fortunate enough to be enrolled in these wealthier systemsand there are some 31,000 pupils in the "outlier" systems identified by defendant[10]are still state public school students attending state public schools. Clearly, the very best and very worst provision that the state makes for students among schools in its school system is a highly relevant matter for inquiry when the issue is differential treatment within the state system. The fact that some local systems do particularly well compared with others is hardly a reason to exempt those systems from constitutional analysis.
Second, experts testifying on behalf of plaintiffs did not limit their analysis to the extremes of the funding continuum, in any case. On behalf of the ACE plaintiffs, Dr. Kern Alexander, a nationally recognized authority on school finance and a University Distinguished Professor at Virginia Tech, reviewed funding disparities not only in the top and bottom systems in terms of revenues and expenditures but also among what he identified as the five wealthiest and five poorest systems,[11] finding a difference of almost $29,700 *116 per classroom of 25 students in one year between the average total state and local revenues of these five wealthiest and five poorest systems. Dr. Alexander testified further that the 20 percent of students receiving the most funds in Alabama had 78 million more education dollars spent on them in a single year than did the 20 percent of students in the lowest funded systems.
For the Harper plaintiffs, Dr. Margaret Goertz, also a nationally recognized school finance expert and a visiting research professor at the Eagleton Institute of Politics, Rutgers University, analyzed funding disparities among school systems which she grouped by wealth into five quintiles, each containing twenty percent of the students. She found a difference of $790 per student available to those systems in the first and fifth quintiles. This disparity amounted to some 4.4 million additional dollars in a single year for an average-sized system of 5,530 students in the wealthiest quintile compared with the poorest quintile. Dr. Goertz also testified that funding disparities in Alabama schools were, in fact, systemwide, with sizable differences among all the quintiles in her analysis.
The Court finds, based on this testimony, that disparities in public school funding in Alabama do not just affect those students in the very wealthiest and very poorest systems; instead, the effects of these disparities are widespread and systemic.
Governor Hunt, however, argues that plaintiffs overstate the extent of differential treatment among students in another way, by excluding federal aid from their analysisaid which has the effect of reducing wealth-based disparities somewhat in Alabama schools because poorer systems tend to receive more federal funds than do wealthier systems. Defendant maintains that, properly analyzed, funding differences in Alabama schools are not sufficiently disparate to be deemed inequitable either in their own terms, or as compared with school funding disparities in other states. Again, the Court disagrees.
Although the Court is persuaded (and plaintiffs do not dispute) that including federal revenues in an equity analysis would make funding disparities appear somewhat smaller, the Court declines to credit such funds to the state's account. Federal aid represented less than 11 percent of combined federal, state and local school revenues in 1990-91, and it is undisputed that a large portion of this aid is used for non-instructional purposes such as school breakfast and lunch programs.[12] Testimony at trial showed that much of the federal aid that is employed for instruction is categorical aid, targeted toward specific population groups (e.g., Indian education) or programs (e.g., ROTC). Further, some portion of this earmarked instructional aid, such as money allocated for adult basic education or Head Start, is not even spent on grades K-12. And, to the extent that the remaining federal funds do finance instruction within the public schools, the evidence showed that these funds typically do not pay for the schools' basic educational programs, but for remedial or compensatory services aimed at bringing disadvantaged children up to the same starting line, as it were, with their peers.
In short, the Court finds that federal aid does not close the gap between wealthier and poorer school systems by financing basic, system-wide school programs or facilities and, thus, it cannot be held to mitigate the disparities in resources that are of primary concern among these systems. Nor are federal revenues intended to have this effect; by law, these funds may be used only to supplement, not to supplant, the public schools' regular program. See, e.g., 34 C.F.R. § 300.230 (1991). Perhaps most importantly, the state of Alabama does not collect or, for the most part, control these revenues, which are not available to advance state educational goals but rather serve (sometimes transitory) *117 federal mandates. The issue before the Court is whether the state meets constitutional mandates in providing public schools, not the federal government. Accordingly, the Court finds that plaintiffs' equity analyses are proper in excluding federal aid.
Further, the Court finds no merit to defendant's suggestion that the funding differences proved by plaintiffs are not sufficiently great to be deemed significant or inequitable. On their face, the disparities in funding cited above appear to the Court quite clearly to be constitutionally meaningful ones. Dr. Goertz testified, for example, that the $790 per pupil difference between the top and bottom quintiles (that is, taking into account 40 percent, or more than 270,000 students) in her analysisone of the more conservative figures citedamounted to a disparity of some $18,000 per classroom in a single year.[13] Dr. Goertz indicated that this amount would buy new textbooks for six class sections, five laminated wall maps, one globe, four bulletin boards, twelve microscopes, and an increase in the teacher's salary to that paid in the top quintile, with some $11,500 left over. In fact, the expenditure figures provided by defendant's own expert, Dr. Michael Wolkoff, which included federal aid, reflected a $55,575 difference per classroom of 25 between the wealthiest and poorest system in a single year; without the "outliers," this gap was still $33,775. Even Dr. Wolkoff admitted that these amounts might look like a lot of money to the teacher at the bottom.
Further, plaintiffs presented testimony at trial that disparities such as these have been evident for at least the past 20 years. The Court finds that the cumulative and, as Dr. Alexander described it, intergenerational effect of differential funding in Alabama public schools is unquestionably significant. Moreover, defendant's own evidence suggested not only that this funding gap is not closing, but that it has actually widened substantially in the last six years. In addition, the Court finds that the comparatively greater educational need shown by plaintiffs to exist in many of the poorer systems further exacerbates the effect of these funding disparities.
In concluding that the differential school funding of which plaintiffs complain is meaningful and substantial, the Court has considered Governor Hunt's argument that greater disparities than those shown in Alabama exist in some other states. This may indeed be truealthough the Court agrees with plaintiffs that it is misleading to draw dollar-for-dollar comparisons of school funding disparities between states like New Jersey, which ranked first in the nation with $9,447 in expenditures per pupil in 1990-91, and Alabama, which was forty-ninth in spending in the same year, with an average of $3,551 per pupil. In fact, a smaller disparity in a low-spending state like Alabama may make a bigger difference in educational opportunity than a larger disparity in a higher-spending state like New Jersey. The issue is the marginal utility of these dollars in each state. Just as a dollar lost to a poor person may be more meaningful than a dollaror even ten dollarslost to a rich person, the disparities in Alabama can only be understood in the context of this state's very low level of educational spending.[14] In any case, school funding problems in other states do not excuse Alabama's own poor performance. Regardless of how our school funding disparities compare with others outside our borders, they are clearly substantial and of profound concern here at home.[15]
Even if school funding disparities are significant in Alabama, Governor Hunt argues that they are not the state's responsibility, but the result of local mismanagement or local choice not to fund schools. However, in *118 deposition testimony admitted at trial, defendant could not point to any particular local school systems that had mismanaged or wasted money. See Hunt Deposition at 102-03. Certainly, defendant offered the Court no systematic evidence that poorer school systems are more prone to wastefulness than are wealthier systems. Thus, defendant's allegations concerning local mismanagement fail for lack of proof.[16]
Governor Hunt's suggestion that funding disparities are primarily attributable to local choice or preference is also unpersuasive. This argument has taken two forms. First, defendant introduced evidence at trial concerning the defeat of local tax referenda, and offered testimony attributing the variation in school spending to differences in a local millage rates,[17] rather than local wealth, with the implication that citizens in the lower spending school systems just do not try hard enough to tax themselves for schools. Plaintiffs responded that millages alone, considered without regard to tax capacity, do not accurately reflect tax effortthat is, how much local citizens tax themselves for schools in relation to their wealth.[18] Experts testifying on behalf of plaintiffs said that the poorer systems actually put forth more tax effort[19] for schools than did the wealthier systems, and concluded that lower funding in poorer schools is primarily a function of fiscal capacity and wealth, not effort.[20] Plaintiffs also argued that defendant's analyses of the relationship of spending disparities to tax millages and to local wealth were flawed because defendant's expert improperly sought to explain disparities in total school expenditures, which include state and federal funds, by differences in local millages and local wealth, and because he used certain sales tax data incorrectly. After reviewing the testimony, the Court finds plaintiffs' evidence persuasive on this point.
Second, Governor Hunt has suggested that local citizens vote down tax referenda primarily because they do not want better schools, or have no confidence that more money will improve schools. However, defendant presented no evidence in support of this contention. Plaintiffs, on the other hand, offered testimony that local tax referenda are in some cases defeated for racial reasons in systems in which whites have fled the public schools. Testimony at trial indicated that opposition to public school taxes in some parts of the state is led by parents and supporters of all-white private schools schools that the state of Alabama supported at the time of their establishment. Thus, in some areas of the state, opposition to school taxes may be motivated by opposition to integrated education rather than opposition to education generally. Further, tax initiatives have historically failed, according to plaintiffs' experts, for reasons unrelated to the educational needs of schoolchildren: for example, most voters do not have children in the public schools, land-owning interests organize *119 to defeat these referenda, or there is low educational aspiration in some areas.
The point is, in the Court's view, that the state, in framing its school finance system, can easily anticipate differences in local tax decisions for a wide variety of reasons. The Court finds that by setting low requirements for local effort, and failing to equalize local funds with state dollars, the state has allowed educational opportunities for schoolchildren to hinge on local tax decisions. For this reason, the state cannot hide behind the claim that it is local citizens who cause school funding disparities, and deny its primary responsibility for the present system and its results.
This point, which concerns the structure of Alabama's school finance system itself, bears further explanation. It is clear from testimony at trial, particularly that offered by Dr. Ira Harvey, who has written the leading history of school finance in Alabama and who testified on behalf of plaintiffs, that state funds do not today play their intended role in the school finance system. Since Alabama's statewide public school system was established in 1854, revenues for schools collected at the state level have been intended in varying degrees to equalize, or compensate for, differences in local school funds. This concept achieved its greatest refinement in Alabama in 1935, when the legislature enacted the Minimum Program Fund, a so-called "foundation" program which was widely regarded as among the leading equalization plans in America. Such programs require a certain level of local tax effort for schools, and then allocate state funds in inverse proportion to local revenues to equalize funding so as to pay for a state-determined minimum education program for all students. Local revenues beyond the minimum level (not, in concept, a bare minimum, but instead funds sufficient for an adequate education) are not equalized.
Although the Minimum Program Fund remains on the books as the chief allocation mechanism for public school funds in Alabama, see Ala.Code §§ 16-13-50 et seq., with the stated purpose of promoting "equalization of educational opportunity for all children in the public elementary and high schools," id. at § 16-13-51(a)(1), it no longer works as intended. This is true, according to Dr. Harvey, for two reasons. First, less than one percent of local school funds are now equalized with state revenues, in part because the level of required local effort (the local millage designated to be balanced by state funds) has not been adjusted since 1938, and it no longer represents a large portion of total local school revenues. Further, only a small partsome $4.7 million of the limited local effort that the state does require is actually equalized, because of an unusual historical circumstance. The 1939 Alabama legislature, concerned that property values and, therefore, local school funds from ad valorem taxes were decreasing as a result of the depression, decided to freeze the assessed valuation of property in the state at $938,297,005 (the 1938 level) for purposes of calculating required local effort. Although, according to Dr. Harvey's testimony, property values have in the succeeding 53 years increased to approximately $20 billion, the equalization requirement for local funds has never been recalculated.[21]
Second, Dr. Harvey testified that the state equalization program also fails to operate as intended because roughly 60 percent of state school appropriations now bypass the Minimum Program Fund, which was originally designed as the primary vehicle for distributing state school funds. Similarly, substantial (albeit unquantified) "pork barrel" appropriations from monies controlled by the governor and the legislature go directly to some school systems without regard to local resources. Because they bypass the Minimum Program Fund, these state allocations are not adjusted to take local wealth into account (that is, they are not inversely proportional to local funds).
In particular, two kinds of appropriations from the Alabama Special Education Trust Fund, the primary repository of state school revenues, fall into this category: the financial *120 assistance program and fringe benefits paid by the state to local school employees. In brief, the financial assistance program is a group of line item appropriations earmarked by the legislature for specific educational purposesfor example, to fund guidance counselors or instructional suppliesand allocated directly to local boards of education based either on the number of students or the number of employees in each local school system. If the number of students is the basis of allocation, then every school system receives a pro rata share of the allocation, regardless of wealth; in other words, such funds are not properly allocated in inverse proportion to local revenue. If the number of employees is the basis for allocation, then more of these funds actually go to the wealthier than to the poorer systems, because wealthier school systems can hire more personnel from local funds and thus, draw more state money from the line item appropriations. The same is true for fringe benefits (health insurance, retirement, etc.) paid directly by the state to local school employees which, again, offer the most benefit to wealthier systems that can afford to pay for additional staff with local funds.
The extraordinary result of these departures from the original intent of the school finance system, according to Dr. Harvey, is that not only do state funds now fail to compensate for variations in local funds, the state actually allocates more state dollars to the wealthier systems than to poorer systems, thus exacerbating the inequalities.[22] For example, as Dr. Harvey testified, Hoover, one of the wealthiest systems in the state, collected $2,532 per student in state revenues in 1990-91, while Roanoke, one of the poorest systems, received only $1,985 per student. This result is the direct opposite of the intended effect of state funds. Thus, the Court finds that state school funds are clearly part of the problem, not part of the solution, and the state cannot simply pin the blame for current funding inequalities on local school revenues.
In any case, the distinction urged by defendant between local and state funding for schools is an artificial one. By law, all public school taxes are state taxes, and all public school funds are state funds, whether collected at the state or local level. See Mobile, Ala.-Pensacola, Fla., Bldg. & C.T.C. v. Williams, 331 So.2d 647, 648 (Ala.1976) (public school funds are state funds whether they come from the state treasury or local taxation); State v. Tuscaloosa County, 233 Ala. 11 [611] 172 So. 892, 894 (1937) ("public school funds, as between the county and the State, are State funds"); Williams v. State, 230 Ala. 395, 161 So. 507, 508 (1935) ("County and district school taxes ... go to the maintenance of state schools, parts of the system of state schools, just as other public school funds."); Hamilton v. Pullman Car Mfg. Corporation, 231 Ala. 7, 163 So. 329, 330 (1935) ("It is true that in a sense a public school tax is a state tax and that a municipality acts as an agent of the state in levying, collecting and disbursing that tax."). For this reason, the appropriate funds to consider in evaluating state funds for education are funds raised for schools from both state and local sources.
Accordingly, the Court finds that funding disparities in Alabama's public schools are substantial and meaningful, that these disparities are strongly related to the relative wealth of local systems, and that the state must shoulder responsibility for the differential treatment of schoolchildren that such disparities represent. What remains to be discussed is whether differences in school funding actually translate into differences in opportunities offered to public school students in the form of educational facilities, programs and services. The Court finds that what common sense suggests in this regardthat school systems with greater resources are generally able to provide more and better educational opportunities than those with fewer resourceswas amply confirmed by plaintiffs' proof at trial.
Evidence to this effect came from several sources: a systematic disparity study of *121 schools in 15 selected school systems, data analyzed by Dr. Goertz and Dr. Alexander, the testimony of State Department of Education and local school officials, and parents, teachers and studentsand, not least, admissions from Governor Hunt himself.
The disparity study introduced at trial by plaintiffs was conducted by three education experts: Dr. Steven Ross of Memphis State University, Dr. Landa Trentham of Auburn University and Dr. James McLean of the University of Alabama. Drs. Ross, Trentham and McLean sent teams to examine school facilities, staff levels, curriculum, and school supplies and equipment in Alabama's seven highest and eight lowest[23] funded school systems as measured by local revenues. In these systems, the observers reviewed 45 elementary, middle and high schools, finding sharp differences in educational conditions and resources between the wealthier and poorer systems. Dr. Ross' testimony was graphic and troubling: for example, he saw "deplorable" restroom facilities in many schools, visited an elementary school gym fashioned from a portable classroom with holes in the floor, and witnessed children at one poorer elementary school playing on imaginary playground equipment. Dr. Ross testified that in his extensive studies of schools he had never before seen conditions as inadequate as those prevailing among some of Alabama's poorest schools.
The Court heard testimony that Dr. Ross' team found an eleven year difference in the mean age of buildings in the state's wealthier and poorer schools, and that the external condition of those buildings, including walkways, parking lots, driveways, and windows, as well as provisions for personal safety and security, were considerably superior in the better funded systems. Photographs showed safety problems in less affluent schools, including deteriorating structures and beer cans, broken glass, mud and even cow manure on school grounds. Safety features such as ramps for students with disabilities, crossing guards, entrance and exit signs and auto pick-up points were also much less in evidence at poorer schools. Further, the condition and appearance of the interior of these facilities such as floors, lockers, water fountains, ceilings and restrooms were considerably better in the wealthier schools, and restroom supplies such as soap, towels and toilet paper were much more likely to be available. Dr. Ross testified that poorly maintained restroom facilities can impair students' sense of well-being andto the extent that students are reluctant to use dirty facilities that do not supply soap, towels and toilet papermay cause anxiety and physical discomfort that adversely affect learning.
Interior lighting levels were also better in more affluent schools, as was the general condition of classroom facilities measured in terms of classroom appearance, student and teacher desks, shelf space, and other resources. For example, 46 percent of poorer schools, compared with nine percent of wealthier schools, had exposed pipes. Less affluent school systems were far more likely to have only window units available for air conditioning, while wealthier schools typically had central air and heat. Better funded schools also enjoyed superior communications resources in the form of public address systems and telephones for public, student and faculty use.
Classroom resources such as student lockers, audio-visual screens, globes, maps, encyclopedias, file cabinets and wall clocks were also more amply provided to students in wealthier schools, as was the case with media center resources such as overhead projectors, VCR players, and carousel projectors. Fifty percent of wealthier schools had audiovisual production facilities, compared with only 17 percent of poorer schools. Science labs were nearly twice as available to students in higher funded schools, and lab equipment was superior in quality and quantity. Similarly, in terms of special classroom facilities set aside for music, band, art and *122 language labs, wealthier schools fared dramatically better than did poorer schools.
Students at more affluent high schools were also consistently offered more and better basketball and tennis courts, running tracks, football, baseball and soccer fields, physical education equipment, spectator stands and player benches, and these facilities tended to be in better condition. At the elementary level, the story was the same: children at the wealthier schools again fared far better than their counterparts in poorer systems.
In terms of attractiveness, spaciousness, and cleanliness, the libraries in the more affluent schools again exceeded those at poorer facilities. Dr. Ross described libraries at low wealth schools that had few books; those books that were available were in poor condition, not properly catalogued and often out of date. At one poorer facility Dr. Ross visited, the latest encyclopedia available was a 1975 World Book. Similarly, disparities were evident in school auditorium facilities, with sound systems, microphones and stage lights far more prevalent in better funded schools. Poorer schools also had inferior health care facilities and first aid supplies.
According to Dr. Ross, in terms of staff levels and staff development, many more wealthy schools than poorer schools had a full-time librarian available, and some of the poorer schools had no librarian at all. Poorer schools had considerably higher pupil-teacher ratios. Principals in better funded schools were paid 26 percent more on average than those with the lowest funding; teachers' salaries exhibited a 13 percent differential. More affluent schools offered teachers appreciably more travel money for professional development, allocated more time for planning, and required less fundraising by teachers. Similarly, Dr. Goertz found systematic disparities among the quintiles she examined in the number of administrators, counselors, librarians, principals, total teachers, regular program teachers, aides and total non-certificated staff available, with the poorest systems experiencing the lowest staffing levels.
From the standpoint of curricular and extracurricular offerings, the more affluent schools also outstripped their poorer counterparts. Students in wealthier schools had more opportunity to participate in extracurricular activities such as the student newspaper, student government, or special enrichment programs, according to Dr. Ross. They were also far likelier to be offered the option of taking instrumental and vocal music, foreign languages, computer training, and courses in drama, debate and psychology.
In addition, the percentage of students enrolled in college preparatory courses such as advanced math, advanced science, foreign language, and advanced placement was greater in the wealthier schools surveyed by Dr. Ross than in the poorer schools. Dr. Alexander confirmed this point, testifying that the five wealthiest school systems in Alabama had at least twice the percentage of students enrolled in advanced math and advanced science than did the five poorest systems in the 1989-90 school year. He found that almost a fourth of the students in the five most affluent school systems were enrolled in advanced foreign language courses in the same period, as opposed to 2.3 percent of students in the five lowest wealth systems. Dr. Goertz also testified that a greater number of students were enrolled in advanced math, advanced science, foreign language, and advanced placement classes in the higher quintiles in her study than in the lower ones.
Further, the Court heard testimony concerning stark disparities in the ability of richer and poorer systems to offer students the advanced diploma program, the requirements of which students must, beginning in 1995, complete to be eligible for admission to the University of Alabama. Dr. Alexander found that 49 percent of high school students in the wealthier systems were enrolled in advanced diploma courses, compared with 29 percent of students in poorer systems, and a vastly higher percentage of graduates of more affluent systems held advanced diplomas than in the poorest systems. DeWayne Key, superintendent of the Lawrence County school system and the initiator of this lawsuit, testified that three schools in his county *123 cannot offer the advanced diploma this year; the same is true for at least one Monroe County high school, according to Homer Williams, the principal of that school. Not a single student graduated from the Lee County school system with an advanced diploma in 1991.
Dr. Ross testified that the educational resources and opportunities available to students in the schools he studied had an impact on student achievement as measured in test scores. He found, for example, that the percentage of students passing the Alabama Basic Competency Test, a test of reading, math and language skills, was substantially greater in the more affluent schools than in the lower wealth schools.
Accreditation records bear out this evidence of disparities among Alabama schools. For example, according to State Department of Education documents, all the schools in the wealthier systems of Mountain Brook City, Homewood City, and Vestavia Hills City are accredited by both the state of Alabama and the Southern Association of Colleges and Schools. In contrast, Lee County, a poorer school system, has no school accredited by the Southern Association. Six of eight schools in Choctaw County, five of eight schools in Lowndes County, and five of seven schools in Wilcox County are not state-accredited.
A number of other witnesses, many of whom actually work or go to school in the state's poorer school systems, confirmed the testimony concerning unequal educational opportunity offered by plaintiffs' experts at trial. Superintendent DeWayne Key, for example, told the Court about deficiencies in educational opportunity in Lawrence County where, of the twelve schools that have libraries, only seven have full-time librarians, while two others have half-time librarians, one is staffed by an aide or volunteers, and two libraries are closed entirely. He cited examples of schools within the Lawrence County system without school nurses, schools that must share guidance counselors, schools that could not offer foreign language or the advanced diploma, schools with more than 40 students per class in some grades, and schools in which teachers had to sacrifice planning time in order to keep up with course overloads.
In the same vein, Superintendent Toreatha Johnson testified concerning problems in Choctaw County with old and inadequate buildings, erosion, unsanitary bathroom facilities and leaking roofs, and told the Court about schools without any gym facilities, central air conditioning, librarians, guidance counselors, music or art programs, or science labs. Alice Lyles, a parent in Choctaw County, and Andrea Dasis and Besstina Lyles, a fifteen year-old and eleven year-old student there, respectively, discussed the shabby and inadequate condition of many buildings in Choctaw County schools, problems with heating and cooling, the lack of counselors, organized sports, music, art, foreign language, computers and science labs in school, and unsanitary bathroom facilities.
Sophia Madison, a parent in Wilcox County, spoke of problems in her county with a lack of counselors, physical education, playground equipment, art, music or drama classes, air conditioning, computers and library books. Morris Moody, a high school principal from Bibb County, testified that his school had poor bathroom facilities, limited space, little playground equipment, no auditorium, inadequate science equipment, and outdated library books.
Jesse Todd, a Dallas County principal, testified that his school had no infirmary, no auditorium, no science equipment, no art, music or foreign language, limited classroom space, and teachers compelled to spend time in fundraising for basic school supplies. And Homer Williams, principal of Monroe Senior High School, testified that his school entirely lacks advanced math, advanced science, science labs, or a certified librarian, and the school's basketball team plays on a half-court gym.
The Court also heard testimony that disparities in educational resources and opportunities exist not just among local school systems, but within these systems as well. Dr. Martha Barton, assistant state superintendent of schools for instructional services, indicated that such disparities are evident among schools within the same system but *124 on opposite sides of the tracksa difference, as she put it, "between the haves and have-nots," which she said frequently in Alabama "means the difference between black and white." Dr. Anita Buckley-Commander, Governor Hunt's education advisor, admitted that intra-system disparities existed among the schools she viewed. And Dr. Ira Harvey told the Court that the boundaries of the separate school tax districts within a local school system have, at times, been used to gerrymander taxable wealth into the predominantly white districts at the expense of black citizens. The Court finds as fact the foregoing undisputed evidence of disparities in educational opportunity offered in Alabama schools.
Finally, according to evidence introduced at trial, the state school system is inequitable because it fails to accommodate the special needs of particular students and schools. The Court received testimony that the current school funding formula is inequitable to students in rural areas because it fails to reflect the costs related to low population density to the detriment of the affected students. Transportation costs and other non-instructional expenses represent a disproportionate share of per pupil expenditures in rural counties. In addition, rural students are disadvantaged because they generally live in areas without large shopping centers and are thus unable to generate substantial sales tax revenues for support of their schools; the state funding formula does nothing to equalize sales tax revenues available to local systems. Moreover, property in rural counties is assessed and taxed at extremely low rates. The Court finds that these inequities in financial resources translate into deficiencies in educational opportunity in such areas as textbooks and library books, computer software, overcrowding and high teacher-pupil ratiosespecially in the lower gradesand poor upkeep of buildings and buses.
In addition to the already overwhelming evidence of differential treatment cited above, the Court finds the testimony of state education officials at the highest levels particularly telling in this regard. In other states facing equity funding lawsuits, these are typically the very officials who have vigorously defended the equity of the system under challenge. Perhaps uniquely, this was not the case in Alabama. Dr. Barton confirmed at trial that there are wide differences in materials, supplies, teachers, teacher training, courses offered and overall resources available among Alabama schools. Superintendent Wayne Teague also testified that some schools have better facilities and educational conditions than others, and that children in Alabama do not receive equal educational opportunity, a point about which his department has repeatedly warned.
As to special education, state officials have forthrightly acknowledged the stark disparities in the opportunities provided to disabled children of this State that are directly attributable to the wealth of the school system these students attend. These disparities exist in spite of state laws requiring appropriate instruction and special services for all disabled children and federal law which places the ultimate responsibility for special education upon the state. The testimony at trial offered by expert witnesses reviewing Alabama's education program and State Department of Education officials who work daily with the program, clearly show that the special education program in Alabama, in their own words, is an exercise in "crisis management." In spite of the efforts of state and local officials, it is clear that the quality of a child's special education programfacilities, instruction, special or related services such as speech, physical and vocational therapydepends entirely upon the system in which the child attends school. It is commendable that wealthier systems direct "local money" into a state program that is inadequately funded, but these efforts only underscore the disparities in special education programs between the wealthy and the poorer systems.
Governor Hunt's witnesses were largely silent on the subject of disparities in educational opportunities manifested among Alabama school systems in course offerings, staff, physical plant, and other facilities and services. Dr. Michael Wolkoff, Governor Hunt's chief witness on the equity issue, had *125 never visited an Alabama public school and declined to speculate as to the point at which funding disparities might have a substantial effect on school programs themselves. Dr. Buckley-Commander, who had viewed some of these facilities, was compelled to acknowledge the disparities she found. And Governor Hunt, for his part, conceded the existence of substantial differences among schools and among school districts in Alabama in the quality of education being provided to students. See Hunt Deposition at 16.
Based on the foregoing evidence, the Court finds that the significant disparities in school funding in Alabama are reflected in meaningful disparities in educational opportunities available to Alabama schoolchildren. The Court finds further that, as a result, the quality of educational opportunities available to a child in the public schools of Alabama depends upon the fortuitous circumstance of where that child happens to reside and attend schoola situation that Governor Hunt himself, according to his own testimony, cannot condone. See Hunt Deposition at 10, 13.
In addition to its general finding of significant school funding disparities, the Court further finds funding disparities in special education. The State of Alabama funds programs for children with disabilities primarily through "additional allocation for special education" and "special education teacher unit" funds.[24] In the 1990-1991 school year, the State of Alabama distributed $98,166,350 in teacher unit money (excluding fringe benefits) and $28,430,144 in additional allocation money to Alabama's public school systems.
Since 1972, the State of Alabama has used a school system's total enrollment to determine how much state money that system receives to educate children with disabilities. Under this "total enrollment method" of distributing special education funds a system receives money earmarked for the education of children with disabilities based on the number of non-disabled and disabled children enrolled.
As Mr. Barry Blackwell, Coordinator for financial and legal support at the division of special education of the State Department of Education testified, the total enrollment method results in school systems with larger percentages of special education students receiving less money per pupil than school districts with fewer special education students. In the 1990-1991 school year, Alabama school systems with enrollments of children with disabilities between five and 9.9 percent averaged $1,756 per child in state funds earmarked for special education. During the same year, systems with special education enrollments between 20 and 24.9 percent averaged only $848 per child. In fact, during the 1990-1991 school year, state funding for special education ranged from a high of $2,087 per pupil in Macon County to a low of $643 per pupil in Carbon Hill City. As long as percentages of special education students vary from system to system, the total enrollment method will result in school districts with high percentages of children with disabilities receiving less per pupil than districts with relatively lower percentages. The Court finds that this is a substantial disparity resulting in inequitable funding for the education of children with disabilities. The total enrollment method is not based on the needs of special education students and does not take into account the number or the cost of educating those children.
Mr. Blackwell further testified that the State Board of Education voted to change the method of distributing funds in a manner to be phased in over the next two years. State funds for special education will be allocated based on a weighted child count. Under this system, school districts with more children who spend the largest part of the school day in restrictive settings separate from their non-disabled peers will receive more funds to defray the greater cost of these intensive placements. School systems which educate children with disabilities with their non-disabled peers will receive less money.
*126 It is undisputed that the effect of this change will be to inject some degree of equity into the funding distribution for children with disabilities. However, the distribution system adopted by the State Board of Education only serves to reduce funding to some systems and to increase funding to other systems. Even with this redistribution of funds there will still be available only 70 percent of the funds needed for special education teacher units and related service personnel to serve currently identified special education students. Even assuming that this system will work as hoped, the testimony is clear that it does not address other fundamental problems with the equity and adequacy of the Alabama special education program. For instance, testimony showed that, at a minimum, approximately 750 additional teacher units are needed for special education students. Important parts of a special education program that are necessary to meet the requirements of state and federal law, such as state administration staffing, monitoring and special education teacher training remain inadequate and, for the less affluent systems, inequitable.
The Board has made efforts to tie special education funding to the cost of providing those services. It is not clear, however, that this change will cure the inequities in funding. First, the new distribution system will take two years to implement. Second, as Dr. David Rostetter, expert witness for the plaintiff sub-class testified, basing revenues on more restrictive placements may encourage school systems to isolate children with disabilities from non-disabled schoolchildren. Such an outcome would result in violation of the obligation under state and federal law to educate children with disabilities in the least restrictive environment appropriate. Dr. Wayne Teague testified that the state will have to monitor closely the impact of the weighted child count method of distributing special education funds on placement of children with disabilities and may change the system again. Therefore, the Court is not prepared to find that the inequities in the total enrollment method of distributing funds have been remedied by the change to the weighted child count method.
Governor Hunt argues that local school boards, rather than the state, are responsible for providing students with disabilities an appropriate education. However, it is clear that substantially all critical decisions regarding allocation of special education funds rest with the state. The state distributes the majority of the total special education revenues used locally. The state altered the mechanism for allocation of this money from total enrollment to weighted child count. The state is the only entity capable of monitoring the effects of this change. As a practical matter, it is clear that meaningful change in special education funding is and must be the responsibility of state, and not local, authorities.

ADEQUATE EDUCATIONAL OPPORTUNITY
Plaintiffs in this lawsuit presented evidence related not only to whether existing educational facilities, programs and services in Alabama's public schools are equitable, but also to whether these facilities, programs and services are adequate. Adequacy connotes sufficiency for a purpose or requirement. This Court is not empowered to determine whether the Alabama education system is sufficient to meet standards or achieve purposes that the Court might itself prefer. But the essence of plaintiffs' adequacy claim is that the state education system fails to meet the standards or achieve the purposes of public education mandated by the Alabama Constitution.
Leading state and national education experts testified at trial that the Alabama school system is not providing students with an adequate education. For example, Dr. Barton, the state official most familiar with the instructional services provided in the public schools, told the Court that the level of spending on education in Alabama is inadequate. Dr. Alexander testified at trial that Alabama's poorer school systems are among the lowest spending systems in the nation, and include some of the worst schools in the country, some of which he referred to as second world facilities. And, as noted supra, *127 Dr. Ross said that the conditions in the low wealth schools he saw in Alabama were the worst he had seen in his travels to schools across the United States. Consistent with these opinions and based on the evidence discussed below, the Court agrees with plaintiffs that the public school system provides constitutionally inadequate educational opportunity to Alabama schoolchildren.
The plaintiffs allege that the Alabama schools are inadequate in both absolute and relative terms. Plaintiffs argue that Alabama schools are inadequate in the absolute sense whether measured by: (1) state and regional accreditation standards; (2) substantive Alabama educational standards, such as those set out in the Alabama Education Improvement Act, Performance-Based Accreditation, and the Plan for Excellence, described infra; or (3) indicators recognized by state officials as appropriate measures of school quality, such as drop-out rates, college-level remediation rates, and the extent to which students are prepared for the workforce. Plaintiffs maintain that Alabama's schools are inadequate in the relative sense in terms of overall school funding in this state as compared with funding for educational systems in other states. Such comparisons have also been adopted by state officials as measures of educational adequacy. The Court will address the absolute and relative adequacy of Alabama's school system in turn.
The first indicator of absolute educational adequacy pointed to by plaintiffs is accreditationthat is, official certification that Alabama schools meet certain professionally recognized minimum standardswhich schools may secure from two different sources: the Alabama Department of Education[25] and the Southern Association of Colleges and Schools, a respected private regional accreditation body that promulgates standards and reviews schools throughout the South. Alabama Department of Education standards obviously represent state-sanctioned criteria for schools. The Court finds, further, that state officials, including Governor Hunt himself, have set Southern Association accreditation as an additional indicator of adequacy.[26] Governor Hunt testified in this lawsuit that, to be adequate, each school should measure up to the standards of the Southern Association of Colleges and Schools. See Hunt Deposition at 35. Dr. Anita Buckley-Commander, the Governor's chief education advisor, also testified that schools that do not meet the standards for accreditation of the state and the Southern Association are not adequate.
However, many Alabama schools in fact do come up short under these professionally recognized standards. Choctaw County Superintendent Toreatha Johnson testified at trial that six of the eight schools in Choctaw County are not accredited by the Southern Association, and that the Choctaw County system does not have sufficient funds to make improvements necessary to bring these schools up to accreditation standards. Other systems that contain schools not accredited by the Southern Association include Macon County, Marengo County, Mobile County, Tallapoosa County, Decatur City, Bibb County, Opelika City, Hale County, DeKalb County, and Perry County. In Lee County, not a single school is accredited by the Southern Association.
In addition, many students in the state attend public schools that do not meet the state's own accreditation standards. According to the State Department of Education's 1990-91 Annual Status Report, five of Lowndes County's eight public schools, and five of the seven Wilcox County schools (including the county's only high school), are *128 not accredited by the state. Choctaw County Superintendent Johnson testified at trial that six of the eight schools in that county are not approved by the state (the same six that are not accredited by the Southern Association). Further, many other systems throughout the state have at least some schools that are not state-accredited, including Mobile County, Decatur City, Monroe County, Bibb County, DeKalb County, Opelika City, and Perry County.
Plaintiffs also demonstrated at trial that many Alabama schools are unable to meet other substantive state education standards. One source of these standards is the Alabama Education Improvement Act, 1991 Ala. Acts 323, an education reform statute recently enacted by the legislature and signed by Governor Hunt, but never funded.[27] Governor Hunt and Dr. Buckley-Commander testified that they view the Act as necessary for Alabama schools to provide an adequate education, see Hunt Deposition at 83; thus, both sides agree that this Act provides a meaningful reference point for assessing minimal educational adequacy.
The Alabama Education Improvement Act includes requirements for Performance-Based Accreditation, a revised method of state accreditation of schools adopted by the State Board of Education. See 1991 Ala. Acts 323 at 619-24. An additional source of qualitative state standards for Alabama public schools is the Plan for Excellence, a blueprint for improvement of Alabama's schools developed by the State Department of Education in 1984. The Plan for Excellence was commended by the Legislature at the time of its promulgation.
Each of these state documents represents an acknowledgement of the present inadequacy of Alabama schools by the state and speaks of the need for major, structural change according to the standards and requirements outlined therein. The Alabama Education Improvement Act states that "[a]ttainment of these goals will require a serious reexamination of every aspect of Alabama's education system and some profound changes in our public schools." Id. at 607. Performance-based accreditation is presented as "a major change in the way accreditation historically has been obtained." The Alabama Performance-Based Accreditation System Manual at 4. The State Department of Education, in introducing the Plan for Excellence, indicated that its "analyses of problems and recommendations for addressing these problems are extensive, touching on almost every area of public elementary and secondary education." Plan for Excellence at 8.
Although all three of these plans for bringing the Alabama schools toward adequacy have been duly adopted by the State Department of Education or the legislature, testimony at trial indicated that funding has not been provided to implement any of them. According to both Dr. Barton and Dr. Buckley-Commander, not a single school system in the state currently meets all of the requirements of Performance-Based Accreditation. For example, in one school system, no students obtained adequate or proficient scores on the most recent Algebra I exam, which is part of the performance component of Performance-Based Accreditation. The Court finds, based on this evidence and that set out below, that Alabama schools today fall far short of the very educational standards that the state of Alabama has determined are basic to providing its schoolchildren with minimally adequate educational opportunities.
School facilities are one clear area of deficiency. The Alabama Education Improvement Act requires that all public schools "[p]rovide acceptable facilities conducive to an effective teaching and learning environment, including safe buildings having adequate space, heating and air conditioning, restroom facilities and sanitary conditions." 1991 Ala. Acts 323 at 620. The Performance-Based Accreditation standards require *129 all schools to provide "appropriate facilities and equipment necessary to reach instructional objectives," because "[t]eachers cannot be effective teachers and students cannot attain expected levels of achievement if facilities are inadequate and equipment is inappropriate or non-existent." Performance-Based Accreditation Standard (hereinafter, Performance) at 1C. Similarly, the Plan for Excellence says that school bathrooms must be sanitary, playgrounds must be safe, classrooms must be well heated and cooled, roofs must be kept in good repair, and deficiencies in facilities should be surveyed and corrected. Plan for Excellence (hereinafter, Excellence) at 91. "Students cannot be expected to concentrate on learning when the temperature is dangerously hot or cold or with the distractions of leaking roofs." Id.
Southern Association standards for facilities are consistent with the Alabama standards, requiring that schools provide appropriate classrooms that are "spacious, safe, functional ... and appropriately equipped for varied instructional programs." Southern Association Standards for Elementary and Middle Schools (hereinafter, Southern Elementary) at 32. The standards call for appropriate library and media spaces see, e.g., Southern Association Secondary School Standards (hereinafter, Southern Secondary ) at 21, "attractive landscap[ing]," id. at 19-20, and maintenance service that provides "systematic repair and care of the site, buildings and equipment." Id. at 22.
Governor Hunt himself has agreed that schools in serious states of disrepair are not conducive to learning, see Hunt Deposition at 67-68, and has said that education in portable classrooms is intolerable if it lasts for "any extended period of time." Id. at 66. He said further in deposition that leaking roofs in school buildings can cause disruption and are not conducive to learning. Id. at 108.
The Court heard striking evidence that these basic, common-sense standards are not met in many school facilities across Alabama. A 1990 Department of Education study, for example, reported that many Alabama school buildings are "old and dilapidated," and that over 555 school buildings in use at the time of the study were 50 years old or older. In Choctaw County, Superintendent Johnson testified at trial, four of the system's eight schools have main buildings that are more than 60 years old.
There is a serious shortage of classroom space throughout the state. The State Department's Summary of Capital Needs found that more than 3,500 additional regular classrooms are needed. According to Dr. Barton and other witnesses, this shortage means that, in many Alabama schools, spaces inappropriate for teaching or learning are pressed into service as classrooms. For example, Jesse Todd, principal of Shiloh Elementary/Middle School in Dallas County, testified at trial that one math class at his school meets in a vocational education building in which the din of power tools sometimes drowns out their lessons. At times, the teacher told students to wear radios with headphones to muffle the noise. Similarly, in Roanoke's Handley Middle School, a State Department of Education needs assessment team found that two classes were meeting in temporary classrooms set up in the school's auditorium. The school also had two small basement classrooms that were "totally unacceptable for instructional purposes."
A Department of Education report found that over 2,200 portable classrooms are in use throughout the state. Superintendent Johnson testified at trial that Choctaw County had 56 "temporary" portable classrooms, some of which have been in place for more than 20 years. Superintendent Johnson testified that the Gilbertown school in Choctaw County is almost entirely made up of portable classrooms today, because a fire destroyed most of the permanent classroom space in the school and for some time there has not been enough money to rebuild it.
The evidence at trial also showed that many schools in Alabama lack basic facilities such as science, computer, and language laboratories. For example, Homer Williams, principal of Monroe Senior High School in Monroe County, testified that his high school does not have a single science laboratory. The only science laboratory at Tipton Elementary/Middle *130 School in Dallas County was condemned and not replaced.
Some schools also do not have such essential facilities as auditoriums, gymnasiums, and playgrounds. For example, three of the schools in Dallas County do not have physical education facilities, and five of the eight schools in Choctaw County do not have gymnasiums. Alberta Elementary School in Wilcox County does not have a single piece of working playground equipment; the swing set has no swings, the seesaw has no board, and there is broken glass strewn around the playground.[28] This is the school mentioned earlier at which Dr. Ross observed children pretending to play on swings even though there were no real swings in the swing set. No elementary school in the Choctaw County school system, and no school of any kind in the Dallas County school system, has an auditorium. Some schools in Alabama are too poorly lit for proper learning. Both Lisman and Shady Grove schools in Choctaw County have classrooms without lights.
A number of Alabama's school buildings have serious structural and maintenance problems. An assessment team that inspected the Handley Middle School in Roanoke recommended that the entire school building be demolished. The Alberta Elementary School's septic tank was condemned because of frequent backups and overflows. The school's main ball field was contaminated with human waste that drained from the septic tank which was visible in the form of large dark spots on the field. The fields surrounding the W.J. Jones School in Wilcox County were also contaminated with raw sewage from a malfunctioning septic tank. "The children used to use the field in spite of the sewage," according to the affidavit submitted by one teacher.[29] "We could smell the odor of the sewage inside the classroom." Although the situation at W.J. Jones is extreme, Dr. Ross testified that he observed safety and health hazards such as beer cans and bottles and broken glass on the grounds of many schools he visited.
Even as basic an item as potable water is not available in all of Alabama's schools. At the John Essex School in Marengo County, the drinking water "has a terrible chemical taste and is undrinkable," according to one parent, who stated in an affidavit that she sent her children to school with bottled water. Teachers at the Essex School tell the students to wait to drink the water until the end of the day because it is so highly chlorinated. Similarly, at the W.J. Jones Elementary School in Wilcox County, the water is sometimes too chlorinated to drink.
In Macon County, Choctaw County, Dallas County, and many other school systems, leaking roofs are a constant problem. It is common for schools to place trash cans under these leaks to collect water that pours into the schools. In one school, leaking roofs caused classrooms to flood and destroyed maps and charts. A teacher at this school reported, "[s]o far we have avoided any accidents resulting from children slipping on wet floors or tripping over the rain-filled trash cans by carefully monitoring the children" but she believed that the roof leaks "could be a hazard to the children's safety."
Testimony at trial also indicated that in many school systems there is insufficient maintenance staff to keep the buildings clean. For example, Morris Moody, the *131 principal of West Blocton High School in Bibb County, had only one maintenance person at his school which has an enrollment of more than 500 students. The record contains numerous accounts of unsanitary bathrooms. The restrooms at the Tipton Elementary/Middle School in Dallas County school "[o]ften ... smell because they are not cleaned," according to affidavit testimony of one teacher at the school. At one school in Tuscaloosa, an inspection committee found that one "trough type [urinal] is in a deplorable state and looks to be absolutely unhealthy." In Choctaw County, human excrement has soaked into the wooden floors at one school, creating a horrible stench.
Many Alabama schools have broken windows and other unremedied maintenance problems. At W.J. Jones Elementary School, there are broken windows that are never fixed or replaced. Many of Choctaw County's schools have old windows whose panes fall out, sometimes during instructional time. Elementary students in Tuscaloosa have been injured more than once because of broken windows.
Further, a number of schools in Alabama are infested with termites and other insects. At one Wilcox County school, termites have eaten through library books and shelves, classroom shelves, and school records in the principal's office. The library at Tipton Elementary/Middle School in Dallas County is also infested by termites, which have "ruined many books and shelves," and Tipton also has problems with rat and ant infestation. Alberta Elementary School in Wilcox County has fire ants, which come up through the concrete floor and range throughout the building.
Although most Alabama schools are in session in August, not all classrooms are air conditioned. None of the classrooms in the main building at the Alberta School, for example, have air conditioning. Superintendent Johnson testified that Choctaw County cannot afford to air condition all of the classrooms in the county, so the Board of Education passed a resolution allowing teachers who could do so to buy their own window units, which they take with them when they change classrooms. Dr. Ross testified that he observed one class in which the teacher did not turn on the window unit, despite the heat, because the noise was worse than the heat.
Governor Hunt suggests that not all schools have problems this extreme, but he concedes that the school system has fallen into "serious disrepair" in many places. Hunt Deposition at 65. He admits that the school system as a whole has "great capital needs" in many systems. Id. at 69. He admits that many students in Alabama are "attending schools in deteriorating buildings." Id. at 65.
School curriculum is another area in which the Alabama school system fails to meet state standards. The Education Improvement Act calls for all high school students to have four years of science and mathematics, and for all students to achieve computer literacy. See 1991 Ala. Acts 323 at 613, 628. The Act says that "[i]t is the intent of the legislature that, in addition to the required courses, elective courses including but not limited to foreign languages, fine arts, physical education, [and] vocational and technical preparation, be available to all students." See id. at 614.
Performance-Based Accreditation contains similar curriculum guidelines, requiring that all students have equal access[30] to "broad and varied curricular offerings" in grades K-8, including art, music, computer education, and physical education. See Performance at 4D. Another standard mandates that all students in elementary grades receive instruction in art and music from teachers certified in those subjects, and that in all other grades visual arts, music and other arts must be offered as electives. See id. at 13D. Further, Performance-Based Accreditation requires that all students have the opportunity to pursue any diploma offered by the Board of Education, including the college-preparatory advanced diploma. See id. at 5D.
*132 Similarly, the Plan for Excellence prescribes that all students in the state have the opportunity to pursue the advanced diploma, see Excellence at 44, and calls for schools to offer instructional programs in creative writing, foreign language, advanced mathematics, science, art, music, and drama. See id. at 43.
Governor Hunt, as noted earlier, testified that state schools should meet the standards set by the Alabama Education Improvement Act, which includes curriculum standards, to provide an adequate education. Defendant concedes, more specifically, that education that does not include the opportunity to pursue the advanced diploma is inadequate. See Hunt Deposition at 55. He admits that students are disadvantaged if they do not have access to algebra, physics, biology, or science laboratories, see id. at 75-76, and he acknowledges that computer skills are "fundamental." Id. at 74.
The Court finds, based on the evidence adduced at trial, that the curriculum offered in Alabama's public schools fails, in many cases, to meet state standards. A comprehensive State Department of Education assessment of all 129 Alabama school systems reported recently that "what is missing and what is needed are the resources and services that could give the children of Alabama a competitive edge, including computer education, music courses, art courses, enrichment programs, advanced science and mathematics courses, foreign language courses, [and] remedial programs for those in need."
As discussed above, a significant number of high schools in the state are not able to offer the advanced diploma, which indicates successful completion of a college preparatory program, and which diploma will be required (or its course equivalent) diploma for admission to the University of Alabama beginning in 1995.
Some Alabama schools are not able to offer the most basic courses. The evidence showed that at Monroe Senior High School in Monroe County, the highest level courses in the math and science curriculum are algebra I and general science; algebra II, trigonometry, calculus, chemistry and physics are not available. In Dallas County, one high school alternates offering chemistry and physics because of a lack of resources. No school in the Dallas County or Roanoke City school systems offers calculus.
Foreign language offerings are limited across the state. In the Dallas County school system, French is the only language offered and there are not enough spaces for all of the students who want to take it. No foreign language class is offered anywhere in the Choctaw County system, except for a satellite video class in Japanese; French and Spanish, which were once taught in some schools there, cannot be funded.
Many schools are not able to offer art, music or drama classes, including, for example, all schools in Monroe and Choctaw County, although there are students talented in these areas who would benefit from the classes. There is no music program at three of four high schools in Marengo County. Shiloh Elementary/Middle School in Dallas County is also unable to offer art, music or drama courses. Shiloh teacher Juanita Brown stated in an affidavit that "the only way that students are exposed to these things is if the teachers bring them into the system at their own expense." In some schools, there is no enriched curriculum of any kind. Superintendent Johnson testified at trial that there are no gifted programs for students in Choctaw County, although a test has identified students who would be eligible if the system could afford to provide such programs.
Plaintiffs also introduced evidence at trial that state staffing standards are not met in many school systems. Performance-Based Accreditation requires that class sizes "not exceed a number that allows the teacher to manage the instructional program and assure that course objectives are met by each student," and sets maximum class sizes ranging from 25 to 35. See Performance at ID. It mandates that all students have equal access to instructional support services including counseling and guidance, library media, and health related services. See id. at 12D. It requires, further, that each school have a library media specialist, and one aide or technician per 500 students or major fraction *133 thereof. See id. at 17D. Performance-Based Accreditation also provides that schools must employ support staff sufficient to ensure "a safe and clean environment." See id. at 2B. It requires that each school maintain a "comprehensive staff development program ... to ensure continuous growth for all personnel." See id. at 3B.
Governor Hunt, again, has acknowledged that the Alabama Education Improvement Act, which includes staffing standards, provides a touchstone for educational adequacy. He has said that better teachers provide students with a better opportunity to obtain an adequate education, see Hunt Deposition at 64, and expressed the view that Alabama must raise its salaries in order to attract and retain better teachers. See id. at 63.
Evidence at trial demonstrated that Alabama schools have serious shortages of educational staff. Dr. Ross' team found that in the lower wealth systems they observed, the largest class size averaged 37.6 at the elementary and high school levels. Lawrence County Superintendent DeWayne Key testified that some schools in Lawrence County have classes with more than 40 students. In Dallas County, class sizes exceed 35 students and some teachers teach more than 150 students in a day. In one school in Barbour County, the pupil-teacher ratio in the first grade was 43:1.
Many schools lack full-time, or even part-time, librarians. In Dr. Ross' study, 37.5 percent of the low wealth schools examined had no full-time librarian; 8.3 percent of low wealth schools had no librarian at all. Of the less affluent elementary schools studied, 50 percent lacked a full-time librarian, and 25 percent had no librarian. Superintendent Johnson testified that there are no librarians in any of the K-8 schools in Choctaw County, which rely on parents and other volunteers to keep their libraries open. W.J. Jones Elementary School has no librarian, and its library is only open several hours a week when two Catholic nuns volunteer. The Alberta Elementary School also has no librarian.
Many schools have no guidance counselors, or fewer than are needed to serve their students adequately as prescribed in state standards. The evidence showed that at Bibb County High School, there is one guidance counselor for 670 students. The approximately 364 students at Shiloh Elementary/Middle School have only a part-time counselor, who also works at another school. The students at Shiloh need more counseling than is available at the school, according to one teacher at the school. Needs assessment audits report that there are substantial unmet counseling needs in the Tuscaloosa City school system. W.J. Jones Elementary School in Wilcox County has a single guidance counselor who comes to the school only one day a week. Two schools in Choctaw County share a guidance counselor, and one school has none at all.
A number of Alabama schools have no physical education teachers. Further, health care in Alabama's public schools is limited. Charlene McKaig, an associate professor of nursing at the University of Alabama at Birmingham, testified that there are fewer than 200 school nurses employed in the entire state for a student population exceeding 700,000 students. In some cases, she testified, this means that students attend school without basic health screenings. The clinic in Choctaw County that performed health screening for students has closed. No school nurse serves the general school population in the entire Wilcox County system.
The Court heard evidence that many Alabama schools have insufficient maintenance staff. As already discussed, this presents health and safety problems, and also compels principals, teachers, and students to take time away from the educational program to clean school buildings. At Bibb County High School, principal John Pratt and his teachers "spend a lot of time cleaning up the school after hours." The Tipton School in Dallas County employs only one janitor working for two hours each day, who is able to clean only the hallways; teachers and teacher aides must do the remaining cleaning. Some teachers, who are responsible by default for dusting, mopping, sweeping, and waxing the floors of their classrooms, personally pay the *134 janitor for custodial work. Parents cleaned the entire W.J. Jones Elementary School last year, including the bathrooms. Likewise, Choctaw County parents have cleaned bathrooms, made drapes and shades, varnished floors, and sanded desks; one parent cleaned the restrooms herself in her child's school four times in a single year.
The Court also heard testimony that many Alabama schools fail to meet state textbook standards. The Education Improvement Act requires all schools to provide adequate textbooks to all students. See 1991 Ala. Acts 323 at 621. The Plan for Excellence declares that "the textbook is perhaps the most important learning tool in the classroom" and that "[u]p-to-date textbooks must be provided, and adequate numbers of books should be available to all students." See Excellence at 48. The Plan for Excellence calls for homework to be required in every subject area. See id. at 30.
Governor Hunt acknowledged, in response to plaintiffs' requests for admissions, that a lack of adequate, up-to-date textbooks may adversely affect a student's ability to learn and achieve. He agreed that students are at an educational disadvantage if they are required to share textbooks or cannot take textbooks home. See Hunt Deposition at 76.
The Court finds, based on trial testimony, that the Alabama school system does not provide students with adequate access to textbooks. State Superintendent Wayne Teague testified that the state's "free" textbook program is underfunded, and that funds allocated for textbooks for grades one to twelve run out by the eighth grade. Dr. Barton testified that there are school systems in Alabama in which the supply of textbooks ranges from "inadequate to woefully inadequate."
Some Alabama schools cannot afford to purchase enough textbooks for every student to have his or her own. For example, at the John Essex School in Marengo County two or three students had to share a single social studies textbook. In high school physics, there were not enough new textbooks for all students so at least one student had to use a different text that was out-of-date. In other counties, scarce textbooks must remain in the classroom, and students cannot take them home to read or do homework. Students may be required to buy their own textbooks in elective courses, since the schools spend their limited textbook money on required courses first. In some schools, a shortage of textbooks means that students are not assigned homework. And some classes are conducted entirely without textbooks.
Although new textbooks may be due in some courses according to the State Department of Education's regular textbook cycle, some systems cannot afford to purchase them. Choctaw County employs some social studies books that date to the Carter Administration, and textbooks are in use at the Bibb County High School that are outdated by as much as 15 years. Some textbooks that are available are in unacceptable condition. A teacher at Shiloh Elementary/Middle School in Dallas County stated in an affidavit that when she taught fifth and sixth grade, she was "ashamed to give some of the science and social studies textbooks to the children; they were falling apart and had masking tape holding them together. There were often pages missing." Schools may assign less expensive paperbacks meant to supplement textbooks as substitutes for the actual textbooks. Although these supplemental books are intended to be "consumed" in the course of the school year, children are in some cases prevented from writing in them so that the books can be reused.
Plaintiffs, further, presented evidence that many Alabama schools are deficient in supplies and equipment. The Education Improvement Act requires that all public schools must provide "adequate resources for instruction ... including ... instructional supplies." 1991 Ala.Acts 323 at 621. The Act calls for all elementary schools to have approved science laboratory facilities for the proper teaching of elementary science courses. See id. Similarly, Performance-Based Accreditation requires that all schools be "properly equipped," providing "[a]dequate material, equipment, and supplies." See Performance at 1C. The Plan for Excellence states that "[f]unds should be provided *135 at a significantly increased rate for the purchase of needed classroom materials, including books, audiovisual instructional materials and the new technology." Excellence at 76. It further says that "[a]ll the supplies and equipment needed to promote excellence in education should be available in every school so that teachers can do the very best teaching job possible," id. at 76, and notes specifically that "the teacher should not be expected to make personal expenditures in order to provide instructional aids for students." Id. at 75.
Governor Hunt has himself admitted that teachers should not have to spend their own money on classroom supplies, see Hunt Deposition at 61, and that they must have the tools necessary to teach. See id. at 62. Governor Hunt has agreed that a shortage of desks and chairs in a classroom can be disruptive to the educational process, see id. at 105, and that lack of access to library books can affect achievement. See id. at 78. He has also said that instances of parents having to send toilet paper and other necessities to school with their children must be brought to an end. See id. at 62.
The Court finds that supplies and equipment in many Alabama public schools do not meet minimally adequate standards. The Plan for Excellence declares that "[m]aterials provided to Alabama's classrooms are woefully inadequate." Excellence at 17. Students at some schools are asked to bring soap and towels to school with them. Dr. Ross' study found that a significant number of low wealth systems lacked toilet paper, soap, and paper towels.
Other important instructional supplies necessary for a minimally adequate education are also not available in many Alabama public schools. All the students at one elementary and middle school must share two microscopes, which were bought with money raised by teachers. One teacher stated in an affidavit that when she taught sixth grade science at this school, she had to show students a picture of a microscope because none were available for use. In Choctaw County, audiovisual equipment, manipulables, and computers are scarce and there are no science laboratories, few microscopes, and only two bunsen burners in the entire county. In Wilcox County, W.J. Jones Elementary School has no general-use computers, and Camden Middle School has only one computer for 500 students.
Furniture at many schools is old and dilapidated. In one classroom in Wilcox County a table at which students sit collapsed after frequent repairs and is now held up by milk crates. In some schools, teachers scavenge for school supplies. One teacher testified that she had furnished her classroom with a discarded projector screen, card catalog, and a set of encyclopedias that she retrieved from the garbage. The encyclopedias are "incomplete, very outdated, and ... falling apart," she said, "but we only go to the library once a week for 45 minutes, so this encyclopedia is often our only research tool."
Libraries in many schools contain old and dilapidated books. The encyclopedia at the Alberta Elementary School library dates from the 1970s. The Silas Elementary School relies on donations of books from a local paper company. Library books in some schools in Marengo and Wilcox Counties are far out-of-date. Some school libraries have no periodicals.
The Court heard testimony that teachers and parents at many schools must conduct candy sales and other fundraisers to raise money for school supplies. Dr. Ross' study found that in the low wealth schools surveyed, close to 70 percent of teachers participate in school fundraising activities. Evidence showed that teachers and classes at some schools are asked to contribute $100 a year from fundraisers. Some schools have monthly candy sales, which detract from teaching time.
Teachers in Alabama also expend extraordinary amounts of their own money on supplies for their classes. Dr. Ross' study found that close to 90 percent of teachers in both lower-and higher-wealth schools spend personal funds on school supplies. Teachers in Dallas County and Tuscaloosa testified that they spent from $500 to $1,400 a year of their own money on supplies including books, pens, paper, batteries, wiring and light bulbs for science projects, games, computer programs, *136 science materials, teaching resource guides, and motivational materials.
Parents are also required to raise money for items such as air conditioners in many schools. One parent's affidavit states that at East Choctaw Junior High School, a child in a wheelchair whose only exercise was crawling on the floor had no carpeted area on which to crawl because the floors were made of cement. The school had no money to carpet the floors, so the child's mother had to hold a bake and rummage sale to pay to carpet a small area for her son.
Student transportation is another area in which Alabama schools fall short of standards. The Education Improvement Act requires that all school systems "[c]omply with the requirements of federal and state governments and agencies and the state board of education with respect to the condition and safety of vehicles, scheduling of routes, training and licensing of drivers and load capacity of buses." 1991 Ala.Acts 323 at 620. The National Transportation Safety Board recommends that all school buses built before 1978 be removed from service.
Governor Hunt has conceded that there is a need for new school buses. See Hunt Deposition at 69. He acknowledged, in response to plaintiffs' request for admissions, that as of January, 1992, Alabama schools were using 1,473 school buses built before 1978that is, buses that do not meet national safety standards.
The Court also heard testimony that Alabama's school transportation system is not funded sufficiently for schools to bring their transportation programs up to standards. Dr. Teague testified at trial that in his tenure as state superintendent of education, the school transportation system has been fully funded only twice. As a result, Dr. Teague said that about 90,000 Alabama students ride buses each day that are older than the National Transportation Safety Board advises.
Superintendent DeWayne Key testified that in Lawrence County, there are school buses in use with up to 300,000 miles on them that he regards as unsafe, but has no funds to replace. All but about 10 of the 52 buses in Choctaw County are 15 years old, and a significant percentage of the buses are 1970 models.
Shortages of working school buses and long bus routes in some school systems lead to rides for children that are more than 100 miles and five hours long in some rural areas. Some buses must drive double routes, which also results in long waiting periods for children. Mechanical problems with buses cause students to miss substantial periods of class time. Students at one Alabama elementary school arrived at school more than an hour late for about one month, and left substantially before the end of the school day, because of a shortage of functional buses. Another elementary school asked parents to leave work and pick up their children at the roadside when one school bus broke down.
In summary, the Court finds the evidence is compelling that many Alabama schools fall below standards of minimal educational adequacy for facilities, curriculum, staffing, textbooks, supplies and equipment, and transportation that have been adopted by the state itself. The Court now turns to evidence offered by plaintiffs related to several other indicators of educational inadequacy in the absolute sense: rates for school drop-outs and college remediation, and students' overall preparation for the workforce.
Plaintiffs offered affidavit testimony from Dr. William Spencer, a professor at Auburn University who conducted a study on the drop-out problem in Alabama for the Governor's own Education Reform Commission, that "high school students in Alabama drop-out at an extraordinarily high rate in comparison with other states." According to Dr. Spencer, Alabama ranked 49th of the 50 states in its ability to graduate students after twelve years in the public school system. He also found that 48 percent of Alabama's adult population does not have a high school diploma. Dr. Spencer testified that the failure to obtain a high school diploma has grave economic consequences for Alabama students; for example, males who do not graduate from high school will earn at least $200,000 less than those who have.
Dr. Spencer's study found that Alabama's high drop-out rate is directly related to the *137 inadequacy of the school system. It found that additional counseling, assistance with academics, and drop-out prevention programs could help reduce Alabama's drop-out rate, and that the absence of such services is the result of inadequate funding.
Governor Hunt admitted the seriousness of Alabama's drop-out problem. He conceded that Alabama's drop-out rate is about 35 percent, and that it is among the highest in the nation. See Hunt Deposition at 57. The Court finds that on this measure of educational adequacy, Alabama again falls short.
Plaintiffs argued that the inadequacy of Alabama schools is shown further by the high number of students who must take remedial courses when they arrive at college. James Purcell, director of matriculation and retention at Shelton State Community College in Tuscaloosa, Alabama, testified at his deposition that at his school, 82 percent of incoming students must take remedial math classes, 68 percent take remedial English classes, and 64 percent take remedial reading classes. Mr. Purcell related his observation that many Alabama students are not prepared to do college-level work, which he attributed to "a poor education system."
The Court is cautious about making generalized findings based on the experience of a single community college. However, Shelton State's service area covers a seven-county region, including Hale, Bibb, Marengo, Sumter, Pickens, Tuscaloosa, and Greene Counties. Additional evidence concerning Alabama students' preparation for higher education came from Dr. Harvey, who indicated that professional schools at the University of Alabama at Birmingham must rely on out-of-state recruiting to generate sufficient numbers of qualified applicants for their programs. Further, Governor Hunt himself has testified that more than 40 percent of all of Alabama's graduating high school seniors need some kind of remediation before they can begin college-level work. See Hunt Deposition at 56. The Court agrees that this evidence confirms inadequacies previously discussed in Alabama's public school system.
Similar confirmation came from trial testimony concerning Alabama students' preparation for the workforce. Dr. Malcolm Portera, vice chancellor for external affairs at the University of Alabama, testified at trial that Alabama's schools are an obstacle to attracting business to the state because of business leaders' perceptions of the inadequacy of Alabama schools and the low skills of its workforce. Dr. Portera cited as an example the decision of General Motors to locate the Saturn automobile manufacturing plant in Tennessee rather than Alabama, which he said was in part due to a poor perception of Alabama schools.
In addition, Jay Garner, senior vice president of economic development for the Mobile Area Chamber of Commerce, testified based on his experience in recruiting business and industry for Mobile that if Alabama's schools were improved the state would be better able to attract quality jobs. John Woods, the chairman of the board and chief executive officer of AmSouth Bancorporation, echoed this sentiment, saying that "[n]o longer are industry investors interested in a `low-skill,' `low-wage' work force. This is not a sales point for our state anymore." John W. Rouse, president and chief executive officer of Southern Research Institute, a contract research organization which provides products and services in engineering, environmental and life sciences, testified by affidavit that the growth and development of his business has been "impeded by the lack of skilled labor in Alabama, and by the widely-held belief by many outside the state that Alabama has sub-standard primary and secondary education and a weak cultural/intellectual environment."
Elmer B. Harris, president of Alabama Power Company, the state's principal electric utility, said that "Alabama's economic development is significantly hampered by an inferior education system in the elementary and secondary grades." He testified by affidavit that "[c]ompanies considering moving to Alabama are acutely aware that, at both the state and local levels, funding for education in Alabama is at or near the bottom compared to other states; that the State's work force is relatively undereducated, resulting in *138 a shortage of skilled labor; and that quality education has been a low priority in our state." Mr. Harris indicated that some 35 percent of job applicants for a broad range of jobs at Alabama Power do not pass pre-employment tests. Similarly, R. Neal Travis, president of BellSouth Telecommunications in Alabama (South Central Bell), testified that his firm must process ten applicants to find one who is eligible for employment. Winton M. Blount, III, chairman and chief executive officer of Winton Blount and Associates, also called the quality of public education in Alabama "a survival issue for business," and said that "our education system in Alabama is not producing the kind of workers necessary to compete in [the] world economy."
Governor Hunt conceded that Alabama's schools are producing large numbers of students who are not prepared to enter the job market, including students who cannot read. See Hunt Deposition at 58. He acknowledged, as an example, that in 1990, Gulf State Steel, a steel corporation in Gadsden, Alabama, announced that it would no longer hire local high school graduates because 70 percent tested below the 8th grade level. See id. Defendant also agreed that without an adequate education it will be difficult for Alabama schoolchildren to compete equally with people from outside Alabama who did receive an adequate education. See id. at 23.
The Court finds, based on the foregoing testimony concerning a variety of measures of absolute educational adequacy, that Alabama's public schools again clearly fall short.
The adequacy of Alabama schools may also be measured in relative terms, compared with other state systems. In this regard, plaintiffs focused their testimony primarily on school funding. The Alabama Department of Education compared spending on schools in Alabama with that prevailing in the nation generally, in the Southeastern states, and in Alabama's neighboring states. It concluded from these comparisons in a 1989 document called Alabama Where Do We Stand?: A Comparative View of Key Educational and Financial Statistics, that "Alabama has failed to adequately finance its public school system." The study found that in 1986-87 Alabama ranked last in the Southeast and last in the nation in per capita spending on education. The report also found that Alabama ranked 11th of the 12 Southeastern states in terms of state and local revenues per pupil in average daily attendance. Updated figures from the Educational Testing Service indicate that in 1990-91, Alabama was 51st in the nation and last in the southeast in state and local revenues per pupil.
Further, the State Department of Education report indicated that the funding gap between Alabama and other states has widened in the past decade, a period in which Alabama's rate of increase in spending was below that of the nation, the Southeastern states, and Alabama's contiguous states. The study concluded that Alabama "is not just stagnant but actually retreating."
Governor Hunt conceded that "more money is needed for education." See Hunt Pre-Trial Brief at 1-2. He acknowledges that the time has come for funding education in Alabama at the proper level. See Hunt Deposition at 83-84.
Based on the foregoing testimony, the Court finds that, in terms of school funding relative to other states, a measure of adequacy adopted by Alabama officials, Alabama's system of public schools has lagged far behind.
Several witnesses for plaintiffs testified to the social and economic costs of the state's failure to provide adequate educational opportunities for its children. Dr. Wayne Flynt, University Professor of History and former chairman of the history department at Auburn University, called Alabama's record of investment in its public schools "abysmal." Both Dr. Flynt and Dr. Harvey testified that Alabama's history is marked by decades of failure to fund its public schools adequately, all too often in this century as a result of racial conflict. According to these experts, repeated educational crises in the state have invariably been followed by a flurry of studies that recommend better funding for public schools; when these go unheeded, they are succeeded by further crises and additional studies. This cycle of failure to *139 invest in education, according to Dr. Flynt, has denied the state the pool of talent necessary to make it competitive in the global economy (or even in the Southeast), and helped create an underclass of citizens who are either incarcerated or dependant on costly welfare, medicaid, or other government social programs.[31]
Alabama's economy, in particular, has suffered as a consequence of low spending on education, according to plaintiffs' witnesses. Dr. Flynt cited a Jacksonville State University study that reviewed state educational expenditures from 1945-85, finding that the level of such expenditures correlated directly with economic growth in those years. In a study conducted in Alabama, Dr. Harold Elder, professor of economics at the University of Alabama, found a definite and consistent positive relationship between funding levels for elementary and secondary schools and state income and employment growth and concluded that greater educational support generally leads to larger incomes and higher employment. Dr. Flynt warned that the South is becoming, economically speaking, two Southsthe Gulf South and the Atlantic Southwith the former, to which Alabama belongs, experiencing a net decrease in the education of its workforce even as the latter improves the job skills of its workers.
Governor Hunt disputes little of the evidence offered by plaintiffs concerning the inadequacy of public schools in this state. He does suggest in trial briefs that the problems cited by plaintiffs are confined to a few isolated school systems. See Hunt Post-Trial Brief at 3. However, defendant has admitted elsewhere that "the overall quality of education [in Alabama] is inadequate." Hunt Deposition at 53-54 (emphasis added).[32] Further, according to Dr. Alexander and Dr. Goertz, even the wealthiest school systems in Alabama have unmet needs and are hardly rich compared with systems in other states. See also Motion For Leave to File Amici Curiae Brief of Mountain Brook City, Homewood City, Hoover City, and Shelby County Board of Education at 3. In any case, plaintiffs challenge the constitutionality of a statewide school system; the Court finds that if inadequate educational opportunities exist in some systems, then the system as a whole must be deemed inadequate.
In addition, Governor Hunt maintains that "plaintiffs' criteria for `adequacy'" are "unreasonable, even impossible, to meet," given the state's "lack of a sufficient tax base." See Hunt Post-Trial Brief at 5. However, the Court notes again that the criteria of adequacy reviewed above originate not from the plaintiffs, but from the state itself. Further, Governor Hunt presented no evidence delineating specifically the limits on the state's tax base to which he refers. In contrast, plaintiffs offered expert testimony that Alabama has substantial unused revenue capacity, that investment in education would likely generate growth in the state's tax base; and that a lack of such investment has high hidden social and economic costs, as discussed abovenone of which are directly disputed by the Governor. Thus, as a factual matter, the governor's assertion that the state cannot afford better schools is doubtful, at best; as a matter of law, it is no defense to a claim of constitutional infringement because individual rights do not obtain only when the state believes that it can afford them, as discussed infra.
Governor Hunt also maintains that "the `adequacy' in funding that plaintiffs seek will not solve the problems that plague Alabama's *140 schools." Hunt Post-Trial Brief at 6. He argues that increased funding of public schools will not translate into increased student performance as measured primarily by certain standardized test scores. This argument relies on the testimony of Dr. Eric Hanushek, a University of Rochester economics professor, who offered the opinion based on his review of multiple "production function" studies[33] performed nationwide by educational researchers, as well as his own study using Alabama datathat there is no systematic relationship between spending on schools and student achievement. Dr. Hanushek did not testify that spending can never positively affect student achievement on tests; his point was, instead, that to date experts have been unable to measure a systematic relationship between expenditures and achievement. He concluded that school money must be spent inefficiently (that is, in ways that do not improve achievement) in this state and elsewhere.
Plaintiffs countered with testimony on this point from Dr. Ronald Ferguson, a professor of public policy at Harvard University, who conducted his own analysis in Alabama and found a systematic positive correlation between student achievement and certain expenditures (that is, money spent to secure smaller class sizes above a certain threshold, teachers with more experience, and teachers who themselves had better test scores). Dr. Ferguson's Alabama study was structured differently from that of Dr. Hanushek in several important respects: (1) Dr. Ferguson did not include all school expenditures in his analysis (eliminating, for example, spending on maintenance, school lunch, and transportation), but focused instead on those instructional expenditures that might be expected to affect student scores directly; (2) Dr. Ferguson used actual test scores, while Dr. Hanushek used only average test scores; (3) Dr. Ferguson used a methodology that simulated gains in achievement over time, while Dr. Hanushek reviewed only levels of achievement in a single year; and (4) Dr. Ferguson controlled for many more variables that could affect student scores (such as race, socio-economic status, and parental education) than did Dr. Hanushek.
On balance, the Court finds that Dr. Ferguson's analysis of the relationship between school spending and student achievement in Alabama is superior in terms of data and research design to that of Dr. Hanushek and, thus, it accepts the view that there is a positive correlation between spending on education and student performance in this state.[34] But, this battle of the experts aside, the Court finds that the results of production function studies alone are in any case not an appropriate basis for concluding that additional funding for public schools is unnecessary or misguided. These studieswhich, as Dr. Alexander testified, were designed for use in ordinary business and manufacturing contextsare rightly controversial when applied to the education field, in which inputs and outputs are complex, data are limited, and some goals designed to be served by public education entirely escape analysis, such as socialization, the protection of public health and safety, the inculcation of moral and civic values, athletic achievement and aesthetic appreciation.
Further, the Court does not, in any case, regard the hypothetical question of whether additional funds, if allocated to Alabama schools, will be spent "efficiently" to secure improvements in test scores as one that is relevant to the matters before it at this time.[35] The question prematurely contemplates imposition of a particular remedy one that defendant characterizes as "throwing money at schools," which Superintendent Teague testified has never happened in this stateand assumes that state officials responsible *141 for school funding, including the Governor, will not take pains to ensure that any additional funds are well spent. The Court is certainly not prepared to presume future inefficiency on the part of the executive and legislative branches. Nor is the Court inclined to accept the self-serving defense that schoolchildren are not entitled to sue for additional school funding and opportunities because the government cannot spend education money properly; if this is true, it is hardly the fault of the students.
Finally, Governor Hunt argues in response to plaintiffs' claim that educational opportunities are provided inequitably and inadequately that this situation is rationally justified by the state's desire to foster "local control" of schools. By local control, defendant means "delegation to the various school districts of a measure of control over what taxes the residents should pay and what level of funding they desire for their schools." See Hunt Post-Trial Brief at 17. Whether or not the present state school system, including the school finance system, is structured so as to be rationally related to the purpose of promoting local control is, in large part, a question of law which will be examined infra.
However, the Court must also address certain factual issues to resolve this question. Specifically, the Court heard testimony from several of plaintiffs' witnesses that, under the present school finance system, many poorer districts do not experience local control they cannot reasonably be said to exercise autonomy to determine "what level of funding they desire for their schools," to "judge for themselves the needs of their children," or "to raise taxes to secure the level of education they wish for the children in their districts." See Hunt Post-Trial Brief at 17; Hunt Pre-Trial Brief at 19, 23; see also Hunt Post-Trial Reply Brief at 18. These systems have severely limited local tax capacity; wish though they may for better educational opportunities for their children, many simply cannot afford them. Indeed, if local tax effort reflects the desire for a higher level of education, citizens in the poorest systems seem to want the most for their childrenbut their hands are tied by the very system that defendant argues is designed to enhance their ability to realize their aspirations. The Court does not understand local control to refer only to local control for the wealthy. Thus, to the extent that school opportunities are dependent upon wealth in this stateand the Court is satisfied that they are in large partthe Court finds that local control is defeated, rather than promoted, by the present state school system.
In addition to claims of inadequacy in educational opportunity asserted by all the plaintiffs, the sub-class represented by John Doe argues that children with disabilities do not receive an appropriate education. Dr. Martha Snell and Dr. David Rostetter, special education experts with years of experience in assessing special education programs, testified on behalf of the sub-class. Their testimony, as well as the testimony of Dr. Kenneth Wilson and Mr. Barry Blackwell, state officials who work in the Division of Special Education Services of the Department of Education, confirmed that many children with disabilities in Alabama are not receiving an adequate or appropriate education.
Along with a graduate student and Dr. David Rostetter, Dr. Snell conducted a five-day review of special education programs throughout Alabama. They visited schools in ten school systems including poorer and wealthier systems. Dr. Snell spent one week observing students with disabilities and their educational programs, including children with a variety of disabilities ranging from mild learning disabilities to those with severe multiple handicaps.
Dr. Snell described, based on her years of experience in special education, seven components that are essential for an appropriate education for children with disabilities: (1) inclusion (the education of children with disabilities with their non-disabled chronological peers); (2) program support (resources needed to support special education statewide); (3) curriculum (the educational goals and objectives in each child's individualized education program (IEP)); (4) instruction (the methods used to teach curriculum); (5) peer support (encouragement and opportunity to socialize with non-disabled peers); (6) preparation for adult life; (7) and collaborative *142 teaming (opportunities, formal and informal, for special education teachers to meet with regular education teachers concerning each child's program and needs).
An appropriate education must be designed to provide educational benefit to a child with disabilities through individualized programs and instruction tailored to the needs of that child. For the child to benefit from these programs, related services such as speech therapy and transportation must be provided. As Dr. Snell testified, the measure of the success of a program is the outcome for that particular child.
In assessing these factors, Dr. Snell found that children with disabilities in Alabama do not receive an appropriate education. The Court agrees, based on the undisputed testimony in this case. Dr. Snell described several deficiencies that she observed in special education programs. Among the most troubling are the complete absence of meaningful transition programs (that is, preparation for adult life), the lack of individualization in instruction, and teacher in-service training and development so poor that teachers do not know enough to ask for help. In a system with the purpose of preparing children with disabilities for adult life, these shortcomings are intolerable.
Dr. Snell also found that disparities in the educational programs of children with disabilities are related to the wealth of local school systems. Children in the poorer systems receive lower quality educational instruction and special services than do children in wealthier systems. This disparity is as meaningful and substantial as the differential treatment of children in regular education programs. Governor Hunt argues that deficiencies observed by Dr. Snell cannot be generalized to the statewide system of special education. While the Court acknowledges that Dr. Snell's study addressed only ten of 129 school systems, testimony from Dr. Wilson and Mr. Blackwell confirmed that these problems are not isolated but widespread in Alabama. Both state officials described a system limited to crisis management and frankly confirmed that the solution to one crisis creates another, because the poorer systems often must take money previously assigned to one area of special education to pay for another service to solve the immediate problem.
Dr. David Rostetter, who was responsible at the United States Department of Education for reviewing and monitoring states to ensure compliance with federal special education laws in 1976-1986,[36] evaluated the second of Dr. Snell's seven components of an appropriate education: program support. Dr. Rostetter visited schools, interviewed education staff at the state and local level, examined documents, and observed programs. The Court accepts Dr. Rostetter as an expert on the requirements of an appropriate education and on the program support needed to implement an appropriate education. In Dr. Rostetter's opinion, program support is essential for effective implementation of the other six factors. Program support consists of four components: (1) policy development and implementation, (2) staff and program development, (3) resources (human and financial), and (4) monitoring and evaluation. Dr. Rostetter's opinions about what constitutes program support are reinforced by the state's own plan for operation and administration of special education programs. The state plan is consistent with state special education statutes and requires the state to implement all the features of program support that Dr. Rostetter addressed.
Dr. Rostetter concluded that Alabama does not provide an appropriate education to children with disabilities. The Court agrees. Deficiencies exist in all four areas of program support which prevents the provision of an appropriate education to children with disabilities.
The Board is responsible for developing policies concerning the content and direction of special education programs. In order to provide an appropriate education, local school systems must implement these policies. *143 However, Dr. Rostetter testified that local authorities do not follow state policy. For example, the state has created guidelines on providing transition services designed to enable children with disabilities to move successfully from school to the community. None of the school systems observed had transition plans for their children with disabilities. Further, in the 1991-1992 school year, the only identifiable money spent on transition programs was $103,566.72, which represented a portion of federal appropriations to 26 school systems for pilot transition programs. Clearly, the failure to provide adequate transition programs is a statewide problem.
One of the most important parts of any educational program is the quality of the teachers who staff it. The Court finds that local authorities are unable to provide the staff and program development needed to ensure even minimum standards in instruction for children with disabilities in Alabama. Dr. Wilson testified that the State Department of Education provides technical assistance to local school systems and offers special education training programs when possible. He also said that money often restricts the availability of these services to school systems. In the 1991 calendar year, state funds financed only one training program in special education. Few school systems have local funds available to provide in-service training to regular and special education teachers and support personnel. This failure adversely affects the education of children with disabilities. As an example, one special education teacher was not even aware of the need to integrate children with disabilities into regular classes and school buildings.
In the area of resource deficiencies, Dr. Rostetter testified that in addition to poorly trained teachers, the state of Alabama has a critical shortage of teachers and support staff. For the 1990-1991 school year, the state reported that it needed several hundred more teachers and related services personnel. Mr. Blackwell testified that some school systems cannot offer programs for children with certain disabilities because they do not have anyone trained or certified to teach in those special education areas. This lack of resources, both human and financial, results in an inappropriate education for many of the state's children with disabilities and contravenes the state's own plan for administration and operation of special education programs.
Dr. Rostetter also found deficiencies in the fourth component of program support: monitoring and evaluation. The state is required by state law and its own state plan to ensure that the local systems are providing an appropriate education to children with disabilities. To enforce compliance, the state department is required by law to withhold funds from school systems that are not in compliance. However, the state is reluctant to take away funds from local systems because lack of money is often already part of the reason school systems are not providing an appropriate education.
Dr. Rostetter testified that the absence of an effective monitoring system has resulted in an inability to identify, investigate, and resolve potential problems revealed during compliance reviews. For example, there are disparities in the number of children identified as disabled in some school systems. In predominantly black districts, 51.77 percent of the disabled population is identified as educable mentally retarded while in predominantly white school districts only 16.32 percent of disabled students are so identified. Conversely, in predominantly black school systems only 10.4 percent of disabled students are identified as learning disabled, while 42.9 percent of disabled students in predominantly white school systems are so identified. These differences in identification illustrate that the state has been unable to correct a problem that should be resolved through its monitoring and evaluation activities.
This Court finds that children with disabilities are not receiving the appropriate education and related services to which they are entitled by state law, regulations, and the state's plan for administration and operation of its special education program. Further, the Court finds that Alabama cannot at present offer an appropriate education to such children because of deficiencies in program support.
*144 In summary, the Court finds that the ACE, Harper and John Doe plaintiffs have proved the inequity and inadequacy of the Alabama public school systems. The Court now turns to the legal consequences of these findings.

CONCLUSIONS OF LAW
Although he concedes the inequity and inadequacy of educational opportunity in Alabama's public schools to a large extent, Governor Hunt contends that this Court "is not the forum to solve the educational woes of this state." Hunt Post-Trial Brief at 2. A ruling in favor of plaintiffs, the Governor argues, "would constitute an encroachment upon the separation of powers doctrine" and invade the legislature's discretion in this area. Id.
This Court acknowledges the broad authority of the executive and legislative branches in the area of public education. However, it is black-letter law that such authority is bounded by the constitution, which is the fundamental and paramount law and represents the supreme will of the people. See Marbury v. Madison, 5 U.S. (Cranch) 137, 176-77 [2 L.Ed. 60] (1803); Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651, 655 (1974); State v. Skeggs, 154 Ala. 249, 46 So. 268, 270 (1908); Ballentyne v. Wickersham, 75 Ala. 533, 542 (1883). When, as in this case, constitutional rights are at issue, "[i]t is emphatically the province and duty of the judicial department to say what the law is," even though the judiciary may interpret the constitution "in a manner at variance with the construction given the document by another branch." See United States v. Nixon, 418 U.S. 683, 704 [94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039] (1974) (citing Marbury, 5 U.S. (Cranch) at 177 (emphasis added)). As the Alabama Supreme Court put it in an analogous case, "[w]e are not persuaded that the legislature has the unbridled authority to govern all aspects of our social and economic life. The legislative discretion is limited by the Constitution to the enactment of laws which do not deny to persons of this state the equal protection of the laws," Peddy v. Montgomery, 345 So.2d 631, 636-37 (Ala.1977) or, this Court would add, any other constitutional right.
Courts in other states faced with education reform lawsuits have rejected separation of powers arguments similar to that offered here by Governor Hunt. The Kentucky Supreme Court said:
The issue before usthe constitutionality of the system of statutes that created the common schoolsis the only issue. To avoid deciding the case because of "legislative discretion," "legislative function," etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.
. . . . .
This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.
Rose v. Council for Better Education, Inc., 790 S.W.2d 186, 209 (Ky.1989); see also Seattle School District No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71, 87 (1978) ("the judiciary has the ultimate power and the duty to interpret, construe and give meaning to words, sections and articles of the constitution"). The Court agrees with courts in sister states that it clearly has the authority and responsibility to rule on the constitutional questions before it. See Helena Elementary School District No. 1 v. State, 236 Mont. 44, 769 P.2d 684, 685 (1989); Dupree v. Alma School District No. 30, 279 Ark. 340, 651 S.W.2d 90, 94 (1983); Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273, cert. denied, 414 U.S. 976 [94 S.Ct. 292, 38 L.Ed.2d 219] (1973); Serrano v. Priest, 5 Cal.3d 584, 487 P.2d 1241, 96 Cal.Rptr. 601 (1971) (rejecting separation of powers objections in education reform litigation). This is particularly true when, as in the instant case, the evidence is clear that the legislative and executive branches have repeatedly failed to address the problems of which plaintiffs complain despite many opportunities to do so.
*145 Governor Hunt also maintains that if the Court decides in favor of plaintiffs, it would improperly interject itself into the affairs of coordinate branches by ordering tax increases and setting priorities for government spending. See Hunt Post-Trial Brief at 6. This misconstrues the judicial role. The Court neither taxes nor spends, but simply decides the case before it, declares constitutional rights and, where necessary, enjoins their violation, as it must in our constitutional system. Many (perhaps most) constitutional decisions in practice have budgetary implications, but the actual fiscal effects of such decisions are controlled not by the Court, but by policymakers, who establish budgetary and tax policy in the first instance, and who must reckon the potential cost of unconstitutional acts in that balance.
Almost 20 years ago, a court in Alabama rejected an argument by then-Governor George Wallace that was virtually identical to that raised by Governor Hunt here. Governor Wallace contended in 1974 that a federal court order entered by Judge Frank M. Johnson, Jr., requiring Alabama's mental institutions to provide minimum levels of psychiatric care and treatment to civilly committed patients would "require heavy expenditures of state funds; that these funds will have to come from other state programs; and that the duty of compromising and allocating funds among the many programs competing for them is a duty which must be discharged by the state governor and legislature alone." Wyatt v. Aderholt, 503 F.2d 1305, 1314 (5th Cir.1974). The Fifth Circuit Court of Appeals found this argument unpersuasive:
It goes without saying that state legislatures are ordinarily free to choose among various social services competing for legislative attention and state funds. But that does not mean that a state legislature is free, for budgetary or other reasons, to provide a social service in a manner which will result in the denial of individuals' constitutional rights.
Id. at 1314-15. This Court, presented with a similar argument in the education context by an Alabama governor in 1992, agrees with the Fifth Circuit.
Governor Hunt's claim that the state of Alabama cannot afford to fund its schools adequately, see Hunt Post-Trial Brief at 5-7 (citing limited tax base and "impossible" state standards for adequacy), also offers no defense in this case. As noted supra, the evidence at trial concerning the state's overall low tax effort based on national standardsand Dr. Flynt's testimony that what the state does not pay for now in quality education, it pays for later in welfare, lost jobs, and prison costsdid not support this allegation. As Dr. Flynt indicated, the state's view of what it can afford to invest in the education of its children historically has changed according to shifting perceptions of educational need, even in the space of a few years. Certainly, the argument that Alabama is too poor to educate her children has been raised before; however, the prevailing view at the turn of the century, during debates surrounding the framing of the 1901 Constitution, was that the state is too poor not to invest adequately in public education.[37]
In any case, "[i]t is a fundamental principle of constitutional law that constitutional obligations cannot be avoided because of a lack of funding." McCarthy v. Manson, 554 F.Supp. 1275, 1304 (D.Conn.1982), aff'd, 714 F.2d 234 (2nd Cir.1983). As the Court put it in Wyatt:
[T]he state may not fail to provide treatment for budgetary reasons alone. "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations." Jackson v. Bishop, 8 Cir.1968, *146 404 F.2d 571, 580 (Blackmun, J.), quoted, Rozecki v. Gaughan, 1 Cir.1972, 459 F.2d 6, 8. "Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights." Hamilton v. Love, E.D.Ark.1972, 328 F.Supp. 1182, 1194.
Wyatt, 503 F.2d at 1315; see also Detainees of Brooklyn House of Detention v. Malcolm, 520 F.2d 392, 399 (2d Cir.1975); Rhem v. Malcolm, 507 F.2d 333, 341 (2d Cir.1974), aff'd, 527 F.2d 1041, 1043-44 (2d Cir.1975); Gates v. Collier, 501 F.2d 1291, 1320 (5th Cir.1974); Pugh v. Locke, 406 F.Supp. 318, 330 (M.D.Ala.1976), aff'd, 559 F.2d 283, cert. denied, sub nom., Newman v. Alabama, 438 U.S. 915 [98 S.Ct. 3144, 57 L.Ed.2d 1160] (1978); Hamilton v. Love, 328 F.Supp. 1182, 1194 (E.D.Ark.1971).
Neither does this Court view the possibility that school funds may be inefficiently or unproductively spent, which was raised by the testimony of Dr. Hanushek, as a valid defense to plaintiffs' constitutional claims. Governor Hunt's argument in this regard is tantamount to a contention that the state is not compelled to offer plaintiffs a constitutionally adequate and equitable education because it is no good at doing so, a position which this Court declines to endorse.
After addressing these preliminary matters, the Court turns now to plaintiffs' constitutional claims.

SECTION 256
Plaintiffs argue first that the failure of the state's system of public schools to provide equitable and adequate educational opportunities to Alabama schoolchildren runs afoul of the state constitutional mandate found in Ala. Const. art. XIV, § 256, which provides: "The Legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years." The Court agrees.
In interpreting and applying § 256, this Court is guided by several broad principles of constitutional construction. "[A] constitution must be liberally construed, with the view of effectuating the intention of its framers; and ... the history of the times in which it was framed, the manner most efficient in securing its objects, and the restraints intended to be imposed and the privileges intended to be granted, must all be taken into consideration in giving a construction to these instruments." State v. Adams, 2 Stew. 231, 238-39 (Ala.1829). A more recent statement of this general standard confirms that "[i]n ascertaining the purpose and intent of [a] constitutional provision or statute, courts may look to [the] history of the times, [the] existing order of things, [the] state of [the] law when [the] instrument was adopted, and [the] conditions necessitating its adoption." Standard Oil Company v. State, 55 Ala.App. 103, 313 So.2d 532, 537 cert. denied, 294 Ala. 770, 313 So.2d 540 (1975).[38]
With these principles in mind, the Court first examines the question of whether § 256 guarantees to Alabama schoolchildren a constitutional right to an education in the terms provided therein.[39] This provision is clearly mandatory: "[t]he Legislature shall establish," the system of public schools. See Elsberry v. Seay, 83 Ala. 614, 3 So. 804, 805 (1888); see also State v. Tuscaloosa County, 233 Ala. 611, 172 So. 892, 893 (1937) (this section called a "mandate"); Schultes v. Eberly, 82 Ala. 242, 2 So. 345, 346 (1887) (1875 prototype of this section "commands," and "enjoins" a "duty"). The Court notes in particular here that the duty imposed is a state rather than a local duty, rendering defendant's argument that localities are responsible for inadequate or inequitable educational opportunities untenable as a matter of law. See Mobile, Ala.-Pensacola, Fla. Bldg. & C.T.C. v. Williams, 331 So.2d 647, *147 649 (Ala.1976) (§ 256 "plac[ed] the primary responsibility for providing education upon the state government"); Williams v. State, 230 Ala. 395, 161 So. 507, 507-08 (1935) ("Every public school is a state school, created by the state, supported by the state, supervised by the state, through statewide and local agencies, taught by teachers licensed by the state, employed by agencies of the state."); see also Lee v. Macon County Board of Education, 267 F.Supp. 458, 466 (M.D.Ala.), aff'd, 389 U.S. 215 [88 S.Ct. 415, 19 L.Ed.2d 422] (1967); State v. Tuscaloosa County, 233 Ala. 611, 172 So. 892, 894 (1937); Southern Railway Co. v. St. Clair County, 124 Ala. 491, 27 So. 23, 25-26 (1899).
Further, the obligation imposed upon the state is a current and continuing one, because the liberal system of public schools commanded in § 256 must not only be established and organized, but also "maintained." Ala. Const. art. XIV, § 256. This duty runs to a specific beneficiary: the statewide public school system mandated by § 256 is intended "for the benefit of the children thereof." Id.
Under these circumstances, there can be no question that Alabama schoolchildren have an enforceable constitutional right to an education as guaranteed by § 256.[40] This view is confirmed by the text of the 1956 constitutional amendment, recently struck down by this Court under the fourteenth amendment to the United States constitution, which read: "[N]othing in this Constitution shall be construed as creating any right to education at public expense." Ala. Const. amend. 111 (1956). As the Alabama Supreme Court explained, "Amendment 111 modified the original educational provision to eliminate any implication that there is a constitutional right to public education in Alabama." Mobile, Ala.-Pensacola, Fla., 331 So.2d at 649.[41] This Court will not presume that the legislature and the people ratifying Amendment 111 did a futile act; clearly, they believed, and this Court agrees, that § 256 guaranteed Alabama schoolchildren a constitutional right to an education[42]a guarantee which is now in effect.
The parties, however, disagree over the content of this constitutional right. Governor Hunt argues that the right guaranteed is merely one "to attend free public schools." See Hunt Post-Trial Brief at 19. According to the Governor, § 256 requires "only that... school[s] will be open to common and general use and `liberally maintained' by the Legislature, which retains great discretion in achieving these goals." See Hunt Post-Trial Reply Brief at 9. "The adjective `liberal,'" the Governor says, "is simply an exhortatory word that conveys the wishes, not the dictates, of our Constitution's framers." See Hunt Post-Trial Brief at 28. "[O]ur constitution merely requires the maintenance of a public school system, with no qualitative standards of adequacy nor any financial duty regarding education." Id.
Plaintiffs argue, for their part, that § 256's mandate that the legislature "shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof," Ala. Const. art. XIV, § 256, is not, as the Governor would have it, devoid of substantive or normative content. Instead, plaintiffs maintain, § 256 guarantees Alabama schoolchildren a right not just to attend any kind or quality of school that their government happens to provide but, instead, a right to go to a school which offers them equitable and adequate educational opportunities. Again, the Court agrees with plaintiffs for the reasons set out below.
*148 As discussed supra, "`[t]he fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute." John Deere Co. v. Gamble, 523 So.2d 95, 99 (Ala.1988) (citation omitted). This is equally true for constitutional interpretation. Hunt v. Hubbert, 588 So.2d 848, 862 (Ala.1991) (Houston, J., concurring in the result). The first step that this Court must take in construing § 256 is to examine the text itself. See John Deere Co., 523 So.2d at 99-100 ("`If possible, the intent of the legislature should be gathered from the language of the statute itself.'") (citations omitted). In this regard, "[w]ords or terms used [in the constitution] must be given their ordinary meaning common to the understanding at the time of its adoption by the people." McGee v. Borom, 341 So.2d 141, 143 (Ala.1976).

RIGHT TO EQUAL EDUCATIONAL OPPORTUNITY
The first matter for inquiry here is whether the language of § 256 supports plaintiffs' contention that the intent of its framers was to provide equal educational opportunities to Alabama schoolchildren.
The Court holds that several critical words and phrases in the text of § 256 justify this view. For example, the fact that public schools are to be provided "throughout the state for the benefit of the children thereof" suggests that not just some, but all children are meant to enjoy the advantages offered by these schools. But, most important for our purposes is the phrase "system of public schools," which the legislature is directed to establish, organize and maintain. What, precisely, is meant by a "system of public schools"? Dr. Alexander, a professor of education who has extensively investigated the history of public or common schools in the United States, has written that "[t]he spirit of public schools is that they be `free' and `equal'." Alexander, The Common School Ideal and the Limits of Legislative Authority: The Kentucky Case, 28 Harvard Journal on Legislation 341, 357 (Summer 1991) (citations omitted). This view of public schools is confirmed by a 1938 American Law Reports (A.L.R.) annotation under the title, "What is common or public school within contemplation of constitutional or statutory provisions[?]," which concluded that "[t]he terms `public schools' and `common schools' have in various cases been regarded, broadly speaking, as meaning schools which are free and open to all on equal terms," citing, inter alia, cases in Arkansas, Kentucky, Maryland, Mississippi, Missouri, Montana, New York, Oklahoma, South Carolina, Virginia and Washington. See 113 A.L.R. 697, 698-99 (1938) (emphasis added).
This understanding of the meaning of a system of public schools finds ample support in Alabama. Dr. Harvey testified that Alabama's first state-wide system of public schools, established in 1854, at the outset declared its intent "to extend, upon equal terms, to all the children of our State, the inestimable blessings of liberal instruction." 1853-54 Ala. Acts 6 at 8 (emphasis added). Further, prominent among the cases abstracted in the A.L.R. annotation is Elsberry v. Seay, 83 Ala. 614, 3 So. 804 (1887), which specifically construed the meaning of the system of public schools guaranteed by the prototype of § 256, appearing in the 1875 Alabama constitution, as follows:[43]
[A] system of public schools has been established in every state of the Union, varying in details, but all preserving the leading feature and distinguishing characteristicthe extension of the opportunities and benefits of popular education to all the children of the state. From the necessity of their origin, and from the fundamental principles on which they are founded and have been fostered, common or public schools have acquired a well-defined popular signification.... With knowledge of this popular meaning, as understood from general history, and especially from the nature and character of the legislation of this state, the convention framed the constitution of 1875 for adoption by the people. Controlled by the conservative principle that the diffusion of knowledge, at least elementary, is essential to the *149 preservation of free government, and, as conducive to this end, the extension of the opportunities and advantages of education through the various parts of the state, the convention declared and incorporated in the organic law that a system of public schools shall be established, organized, and maintained; but, for the first time in the state constitution, specially designated its character, extent and purposes. The constitutional system of common schools must extend throughout the state, and must afford equal benefit to all the children thereof within the specified years. The general assembly is without authority to establish a system of common schools which does not possess, in its entirety, those distinguishing features. It is more than a presumption that the term "public schools" was employed in the constitution in its popular meaning and sense,the system of public schools to which the people of the state had been accustomed, and as they would understand it, in adopting the constitution. As we have said in another case, the system of public schools commanded to be established, organized, and maintained, was intended to operate upon, and in favor of, all the children equally, without special local privileges to any. Schultes v. Eberly, 82 Ala. 242, 2 South.Rep. 345.
Id., 3 So. at 806-07 (emphases added).
Three years after the Elsberry case was decided, in 1890, State Superintendent of Schools Solomon Palmer wrote, in an essay addressing "The Legal Status of the Public Schools," that:
The public school is the great highway to knowledgeto enlightened citizenship. As all are compelled to contribute to its support, so all have a right to use it, but none must be allowed to use it so as to interfere with its enjoyment by others. Equality in maintaining and equality in enjoying, is the proper motto for every public school. The public school, the public highway to knowledge and enlightened citizenship, is the common property of a people differing widely in intelligence, in opinions, in wealth, in traditions, in social position, in morals, and in religion. But no matter what one's station or rank, whether high or low, rich or poor, his legal rights and obligations are as fixed and inviolable in the public school as in the State itself.

Palmer, "The Legal Status of the Public Schools," Thirty-sixth Annual Report of the Superintendent of Education of the State of Alabama (1890) (hereinafter, Palmer Report) append. H at xcv (emphasis added).
Thus, under the 1875 constitution, there is little doubt that the "system of public schools" there mandated was intended to provide equal educational opportunity. Did the "defined popular signification" of these terms, Elsberry, 3 So. at 805, change in the 11 years between the time of Superintendent Palmer's report and the 1901 constitutional convention? The Governor offered no direct historical evidence that it did so, and the framers certainly retained the phrase "system of public schools" intact in § 256 of the 1901 constitution.[44] However, Governor Hunt contends that because the framers struck the word "equal" as a modifier for "benefit" from the education clause in 1901, it cannot be argued that § 256 was intended to provide the equality of educational opportunity for which plaintiffs sue.[45]
Section 256, on its face, offers no explanation of the significance of this change. In *150 such a case, "[t]he proceedings of constitutional conventions are valuable in determining the meaning and purpose of constitutional provisions." Hunt, 588 So.2d at 854. It is evident from these proceedings, as plaintiffs and defendant essentially agree, that "equal" was stricken from the constitution for racial reasons, apparently to avoid any explicit requirement for equal treatment of the races other than for school terms of equal duration.[46] However, if this deletion were intended to discontinue equal educational opportunity for whites, or otherwise to alter the common understanding of the equitable operation of a system of public schools, it is not apparent from the constitutional proceedings.[47]
Instead, President Knox's opening address called for a system of public schools that would place an adequate education "within the reach of every child of the state, both rich and poor." Official Proceedings at 15. Perhaps most telling, even as he introduced the Education Committee's proposed education article, from which "equal" had been excised, John Brown Graham, the chair of that committee, summarized the consensus of the convention in the strongest possible terms:
I believe that the delegates of this Convention are unified upon the one subject of public education for all the children of this State, and that they believe it should fall, as the dews and gentle rain, upon all alike, without reference to their condition.
Id. at 4162-63.
Further, subsequent to the ratification of the 1901 constitution and § 256, the Alabama Supreme Court in In re Opinions of the Justices, 229 Ala. 98, 155 So. 699 (1934), held that the same egalitarian definition given by the Ellsberry Court to the constitutional system of public schools in 1875 applies to § 256 of the 1901 constitution, which the Court construes today:
With that interpretation of what the Constitution of 1875 meant by public schools, the adoption of that of 1901, in so far as it preserves the essential features of the former in this respect included the interpretation of it which this court had previously made.
In addition to that thought, it seems clear to us as an independent proposition that the public schools are thus correctly defined.
Id. 155 So. at 701 (emphasis added).
Governor Hunt argues that In re Opinions of the Justices is not authority for plaintiffs' claims because opinions of this kind are advisory only; further, he says, the "essential features" of the education clause did change with the striking of the modifier "equal" from the text, so as to render the Court's previous definition of public schools inapplicable. See Hunt Post-Trial Reply Brief at 7-8. As to the former argument, this Court is, of course, aware that opinions of the justices are non-binding. Alabama Education Association v. James, 373 So.2d 1076, 1081 (Ala.1979). However, the constitutional interpretation offered by a unanimous Supreme Court some 34 years closer than we to the constitution at issue is highly persuasive. Further, the same Supreme Court in Tucker v. State ex *151 rel. Poole, 231 Ala. 350, 165 So. 249 (1935), reaffirmed in a non-advisory opinion that the system of public schools mandated by § 256 must operate in favor of all children equally. Id. at 356 [165 So. 249].
As to the latter argument that the "essential features" of the education clause changed when "equal" was excised, the Opinions and Tucker Court, which itself set this test, appeared in construing § 256 as a guarantee of equal opportunity to believe to the contrarythat the deletion of "equal" did not at all change the essential features of that clause, a point much to plaintiffs' benefit. Furthermore, even if these essential features were not preserved, "it seem[ed] clear to [the Court] as an independent proposition that the public schools [were] thus correctly defined." Opinions, 155 So. at 701 (emphasis added).
The facts adduced by plaintiffs at trial many of which were, again, undisputed or even affirmatively admitted by defendant demonstrate profound and systematic inequities in the educational opportunities offered to schoolchildren in this state. The present system of public schools cannot be said to offer education to Alabama schoolchildren on equal terms or with equal benefit, or "to operate upon, and in favor of, all children equally, without special local privileges to any." Opinions, 155 So. at 701 (citing Schultes v. Eberly, 82 Ala. 242, 2 So. 345 (1887)). Educational opportunities in this state do not "fall, as the dews and gentle rain, upon all alike, without reference to their condition." Official Proceedings at 4162-63. Accordingly, the Court holds that Alabama's present system of public schools violates the constitutional right of plaintiffs to equal educational opportunity as guaranteed by Ala. Const. art. XIV, § 256.

RIGHT TO ADEQUATE EDUCATIONAL OPPORTUNITY
Plaintiffs raise a related, but distinct, claim that they have the right to an adequate education under the Alabama constitution. It would, of course, be possible for the state to offer plaintiffs equal educational opportunity but still offer them virtually no opportunity at all. The question, thus, is whether the right to a public education guaranteed by Section 256 has any substantive content aside from any requirement of equality. The Court holds that such content is fairly inferred from this provision.
Education has long held a special place in Alabama's constitutional order. Every constitution since statehood has recognized the importance of public education and expressly imposed responsibility on the state to take affirmative steps to provide education to Alabama's children. Each of the six Alabama constitutions since 1819 has contained express provisions relating to education, and with each new constitution Alabama's stated commitment to education has become stronger.
The Constitution of 1819, Alabama's first constitution after statehood, declared in Article VI: "Schools, and the means of education, shall forever be encouraged in this state." Ala. Const. of 1819, art. VI. This education clause further provided that:
[T]he general assembly shall take measures to preserve, from unnecessary waste and damage, such lands as are or hereafter may be granted by the United States for the use of schools within each township in this state, and apply the funds, which may be raised from such lands, in strict conformity to the object of such grant.
Id. Article VI of the 1861 constitution was identical to this provision. With these provisions, both the 1819 constitution and the 1861 Constitution acknowledged the importance of education and imposed a strict duty on the legislature to see that funds raised from federal lands granted for the use of schools (one sixteenth of each township was so designated) were applied in conformity with this purpose.
Beginning with the 1865 Constitution, the state was expressly directed to enact laws for the encouragement of education and the promotion of schools. The 1868 Constitution created a state board of education, and in Article XI, § 6 imposed a duty on the state:
to establish, throughout the state, in each township, or school district which it may have created, one or more schools at which all the children of the state, between the *152 ages of five and twenty-one years, may attend free of charge.
Ala. Const. of 1868, art. XI, § 6. In addition, one-fifth of total state revenues were dedicated exclusively to the maintenance of public schools. Ala. Const. of 1868, art. XI, § 11.
The 1875 constitution continued to impose upon the state an obligation to provide Alabama's schoolchildren with a public education. For the first time, the constitution spoke of the obligation to organize a "system" of public schools:
The General Assembly shall establish, organize, and maintain a system of public schools throughout the State, for the equal benefit of the children thereof between the ages of seven and twenty-one years ...
Ala. Const. of 1875, art. XIII, § 1. In addition to the funds derived from federal land grants and certain other earmarked revenues, the 1875 constitution mandated an annual legislative appropriation of $100,000 for the support and maintenance of public schools and further provided that "it shall be the duty of the General Assembly to increase, from time to time, the public school fund, as the condition of the treasury and the resources of the state will admit." Ala. Const. of 1875, art. XIII, § 5.
The drafters of the 1875 Constitution promoted public education as one of the highest duties of government. The President of the Constitutional Convention opened the proceedings by stating: "Republican institutions rest upon the common intelligence of the people; therefore, one of the highest duties of Republican Government is the education of the massesfor there can be no progress without education as there is no civilization without intelligence." Journal of the Constitutional Convention of 1875 at 5-6. Writing in the years after the adoption of the 1875 Constitution, Superintendent of Education Solomon Parker wrote that the demand for free public schools sustained and controlled by the state was
so potent.... that their establishment and maintenance are solemnly enjoined by the fundamental law of the State.... No system can accomplish these great endsso indispensable to good governmentwithout ample means, faithful school officials and competent teachers, which the State is under obligation to furnish.
Palmer Report.
The 1901 Constitution continued and broadened the state's responsibility for assuring Alabama schoolchildren the right to an education at public expense. This constitution declared that it was the obligation of the state to "establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years." Ala. Const. art. xiv, § 256. And it strengthened the language of the education article of the 1875 constitution to read, in part: "[I]t shall be the duty of the legislature to increase the public school fund from time to time as the necessity therefor and the condition of the treasury and resources of the state may justify...." Id., § 260.
The history of the 1901 constitution makes clear the framers' strong commitment to education. President Knox declared in his opening statement the importance of "a well regulated system of public schools, so as to place within the reach of every child in the state.... such instruction as will qualify him for the responsible duties of life." Official Proceedings at 15. Dr. Harvey provided additional evidence at trial that the framers were firmly committed to the education of Alabama's schoolchildren.
The framers' firm commitment to education is reflected in the strong language that they employed in the education clause of the 1901 constitution. Section 256, the education provision now in effect, directs that the state's system of public schools must be a "liberal system." Ala. Const. art. XIV, § 256. The Court accepts as the prevailing interpretation of "liberal" at the time of the framing of the 1901 constitution that offered by Dr. Harvey and Dr. Flynt at trial as historically correct: "generous," "bountiful," and "broad-based" in the sense of preparing one for future citizenship. See Vincent v. County Board of Education, 222 Ala. 216, 131 So. 893, 894 (1931) ("Liberal ... [a]s applied to the public school system ... intends *153 a system as generous and bountiful as a just consideration of the limited power of taxation and the varied needs of the state will in reason justify.") (emphasis added). This Court finds that the "ordinary meaning" of these words, "common to the understanding at the time of its adoption by the people," McGee, 341 So.2d at 143, is a system of public schools that is generous and broad-based in its provision of educational opportunity and that meets evolving standards of educational adequacy.
American statesmen and political theorists have long used the word "liberal" to connote an education that is broad and generous in its provision. For example, John Adams, our second President and a thoughful commentator on the nation's government and institutions, declared that "laws for the liberal education of youth, especially of the lower classes of people, are so extremely wise and useful, that no expense for such a humane purpose would be extravagant." Palmer Report at xcvi.
Thomas Jefferson, in Public and Private Papers, A Bill for the More General Diffusion of Knowledge, Section I (Vintage 1990) at 39, cited illumination of the minds of the people as "the most effectual means" of preventing tyranny; the representatives who make and administer laws, he said, "should be rendered by liberal education worthy to receive and able to guard the sacred deposit of the rights and liberties of their fellow citizens, and ... they should be called to that charge without regard to wealth, birth or other accidental condition or circumstance." Id. Here in Alabama, the preamble to the 1854 Act to Establish and Maintain a System of Free Public Schools in Alabama stated that one of its purposes was to extend to all the children of the state "the inestimable blessings of liberal instruction." 1853-54 Ala. Acts 6 (emphasis added).
The history of the 1901 constitution supports plaintiffs' contention that a "liberal system" of education is a generous one. As sentiment in Alabama grew for calling what became the 1901 constitutional convention, State Superintendent of Education John O. Turner urged that provision of a liberal education be foremost in any new constitution:
The only way to make Alabama able to support a public school system is to educate her people and they will become prosperous. This will have to come first, poverty or no poverty. There is not an example to the contrary in the history of mankind. Education is the greatest agency of prosperity. If you are anxious for the prosperity of your people, then you will lose no time in giving them a "liberal" education. Intelligence is a great money maker. If you wish to make Alabama grow in wealth and progress, you must have general intelligence and skilled labor. Let it be the foremost principle of your new Constitution, if you really intend to hold a Constitutional convention.
Superintendent John O. Turner, "Speech Before the Southern Education Association," Annual Session 1896 Mobile, Alabama, December 30, 1896 (hereafter, Turner Speech) (emphasis added).
Governor Joseph F. Johnston's message to the General Assembly on December 1, 1896, addressing the need for a new state constitution, also emphasized the importance of a renewed and strengthened state commitment to public education. Speaking not long before the constitutional convention was held that produced the current Alabama constitution, Governor Johnston remarked:
The State has a vital interest in each citizen, in his morality, his intelligence and his capacities, as the average intelligence rises, the value of citizenship increases. We are pledged to develop our public schools to the limit of fair taxation and this pledge must be rigidly adhered to and faithfully kept with the people who have trusted us. We can better afford to reduce salaries, diminish the number of courts and abolish many offices rather than put the knife into a dollar appropriation for our free schools. The most wasteful profligacy would be the checking of the growth of education, now making but feeble progress.
Printed with Turner Speech at 23.
In addition to the word "liberal," it is significant that Section 256 mandates not only the "establishment," but also the "organization" *154 and "maintenance" of a "system" of public schools "throughout the state." By imposing upon the state a duty to organize and maintain a system of education, § 256 also implies a continuing obligation to ensure compliance with evolving educational standards. Section 256's requirement that the system operate "for the benefit" of school-age children likewise obligates the state to provide its children with an education that will in fact benefit them by offering them appropriate preparation for the responsible duties of life.
The Alabama courts have long emphasized that the Alabama constitution is to be given a broad and generous reading. The Alabama Supreme Court has stated that unlike statutes, "[c]onstitutions are always intended to lay down general principles." State v. Adams, 2 Stew. at 238. As the Adams Court stated:
It is obvious, then, that a constitution must be liberally construed, with the view of effectuating the intention of its framers; and with that the history of the time in which it was framed, the manner most efficient in securing its objects, and the restraints intended to be imposed and the privileges intended to be granted, must all be taken into consideration in giving a construction to these instruments.
Id. at 238-39.
In the instant case, the factors that must guide this Court in the construction of § 256 all point to the same conclusion. This Court finds that the state of Alabama has a strong historical commitment to education that it has expressed with increasing force in each of its six constitutions. And this Court finds that § 256 of the 1901 constitution, in its requirement that the state "establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof," requires the state to provide schoolchildren with an education that "will qualify [them] for the responsible duties of life." Official Proceedings at 15. A system of public schools that provides all children with a minimally adequate education is the only kind of system that conforms with a liberal reading of the constitutional text, comports with the intent of the provision's framers, and grants the intended beneficiaries of this provision "the privileges intended to be granted."
Governor Hunt suggests that the right to education contained in the constitution is a weak one that is almost devoid of substantive content. This Court finds that this view is not supported by the text and history of § 256. To the contrary, the Court finds that the Alabama constitution's education guarantee is one that accords schoolchildren of the state the right to a quality education that is generous in its provision and that meets minimum standards of adequacy.[48]
In reaching the decision that it does today, this Court is mindful that courts in numerous other states have found that their own state constitutions contain substantive rights to education. See, e.g., Rose, 790 S.W.2d at 210; Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859 (1979); Seattle School District No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71 (1978); Abbot v. Burke, 119 N.J. 287, 575 A.2d 359 (1990). Opinions such as these are of course not binding upon Alabama courts, but other courts' interpretations of their respective state constitutions can provide useful guidance to the courts of this state. As the Kentucky Supreme Court has noted, opinions of this kind "show that courts may, should, and have involved themselves in defining the *155 standards of a constitutionally mandated educational system." Rose, 790 S.W.2d at 210.
In Seattle School District No. 1, the Washington Supreme Court approved the trial court's conclusion that "ample" in the education clause of the state's constitution means "liberal, unrestrained, without parsimony, fully sufficient," and noted that what is "ample" changes with the times:
[T]o suggest that the State fulfills its duty to make such provision by merely providing more acceptable educational facilities than those of 1889 is utter nonsense. We cannot ignore the fact that times have changed and that which may have been "ample" in 1889 may be wholly unsuited for children confronted with contemporary demands wholly unknown to the constitutional convention.
However, to recognize changing times is not to change the constitution. Quite to the contrary. We must interpret the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning.
Seattle School District No. 1, 585 P.2d at 94.
In Abbott v. Burke, 119 N.J. 287, 575 A.2d 359, 410 (1990), the New Jersey Supreme Court defined a constitutionally sufficient education under its state constitution's education clause as "one that will equip all the students of this state to perform their roles as citizens and competitors in the same society."
In Rose, the Kentucky Supreme Court considered other state court decisions such as Pauley v. Kelly, along with Kentucky constitutional history and case law and opinions of experts, and concluded that the Kentucky constitution mandated that the state provide schoolchildren with an adequate education. See Rose, 790 S.W.2d at 212. The West Virginia Court defined the education required by its state constitution's education clause as one that: "develops, as best the state of educational expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically." Pauley, 255 S.E.2d at 877. The Rose Court defined an adequate education as one that has as its goal the development of the following seven capacities:
(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.
Rose, 790 S.W.2d at 212.
The Court, after careful consideration of the text, history, and purpose of § 256, and the expert evidence and the record in this case, concludes that § 256's mandate of a "liberal system of public schools" dictates certain standards of adequacy for Alabama schools, as set forth in the Court's order.
Plaintiffs in this case have presented a stark record of educational deficiencies in schools across Alabama. They have shown serious shortcomings in facilities, curriculum, staffing, supplies, textbooks, transportation, special education, and other areas. They contend that the education that they are being provided by the state of Alabama deprives them of adequate educational opportunity and does not comport with the substantive requirements of a "liberal system" of education. For the foregoing reasons, this Court agrees that the education provided to plaintiffs is not adequate to meet the requirements imposed upon the state by § 256 and is therefore not in conformity with the Alabama constitution.

*156 EQUAL PROTECTION

Plaintiffs contend that the state's failure to provide public schoolchildren with equal educational opportunity violates not only § 256, but also §§ 1, 6, and 22 of the Alabama constitution. "Sections 1, 6, and 22 of Article I, Constitution of Alabama 1901, combine to guarantee the citizens of Alabama equal protection under the laws." Plitt v. Griggs, 585 So.2d 1317, 1325 (Ala.1991); see also Moore v. Mobile Infirmary Association, 592 So.2d 156, 165 (Ala.1991).
In order to analyze an equal protection claim, the Court first must determine the level of scrutiny that it should apply to the differential treatment at issue under the Alabama constitution. Federal equal protection jurisprudence traditionally employs three tiers of scrutiny (sometimes referred to as strict, intermediate, and deferential or rational basis review) depending upon the character of the rights at stake, the individuals disadvantaged, and the reasons asserted for the differential treatment. Although in certain fact situations, the Alabama Supreme Court has found no reason that its analysis of the equal protection issues under the United States constitution was not equally applicable to those same issues under the Alabama constitution, Jefferson County v. Braswell, 407 So.2d 115, 119 (Ala.1981), the Court has plainly stated that it does not view cases interpreting the federal constitution as controlling or compelling the results it reaches under analogous clauses of the Alabama constitution. See, e.g., Peddy v. Montgomery, 345 So.2d 631 (Ala.1977).
As a plurality of the Alabama Supreme Court recently indicated, "[s]tate courts, in determining the scope of rights guaranteed by their own constitutions, are not compelled exactly to correlate their standards of review to the `three-tiered scrutiny' employed by the federal courts and may, in fact, provide more protection for private rights than the United States Constitution requires." Moore, 592 So.2d at 170.[49] In Moore, the Court struck down a statutory cap on punitive damages as an impermissible infringement on the right to trial by jury, determining that this exercise of legislative power was unreasonable. The test of reasonableness applied by the Court was whether the differential treatment at issue is "reasonably related to the stated objective, and ... the benefit sought to be bestowed upon society outweighs the detriment to private rights occasioned by the statute." Id. at 166. The plurality did not "find it necessary or useful to identify precisely which of the two lower levels of federal scrutiny [this] standard of review corresponds with." Id. at 170. However, this standard does appear to be something more searching than federal "minimum scrutiny"; the opinion itself suggested that the Court's review was "heightened" and that the Court acted with "vigilance on behalf of individuals encroached upon by government regulation." Id. (quoting Mt. Royal Towers, Inc. v. Alabama Board of Health, 388 So.2d 1209, 1214 (Ala.1980)) (emphasis added).
In any event, this Court holds that the Alabama system of public schools fails to provide plaintiffs the equal protection of the laws under any standard of equal protection review. For the reasons set out below, the Court holds that plaintiffs are entitled to strict scrutiny of the differential treatment at issue here. The Court also reviews the challenged inequalities under the more deferential standard of mere rationality. In each instance, the result is the same: the present system of public schools in Alabama cannot survive equal protection scrutiny.
Plaintiffs argue that education is a fundamental right under the Alabama constitution and, therefore, that rigorous or strict scrutiny is appropriate. To this Court's knowledge, the Alabama Supreme Court has not explicitly set out the criteria by which courts should determine whether a right is fundamental for purposes of equal protection review under the Alabama constitution. Some state courts that have held education to be a *157 fundamental right under their constitutions have done so based on the emphasis placed within those documents on the state's mandatory duty to educate its children. See Washakie County School Dist. Number One v. Herschler, 606 P.2d 310, 333 (Wyo.), cert. denied, 449 U.S. 824 [101 S.Ct. 86, 66 L.Ed.2d 28] (1980) ("In the light of the emphasis which the Wyoming Constitution places on education, there is no room for any conclusion but that education for the children of Wyoming is a matter of fundamental interest."; Pauley, 255 S.E.2d at 878 ("the mandatory requirement of `a thorough and efficient system of free schools' ... demonstrates that education is a fundamental constitutional right in this state.") Other courts have looked, in addition, beyond the four corners of their constitutions to such matters as the "fundamental importance placed on education by the founders of our state," Serrano II, [18 Cal.3d 728] 557 P.2d at 950 [135 Cal.Rptr. at 365], the view that education is one of the "rights and liberties which lie at the core of our free and representative form of government," id. [557 P.2d] at 952 [135 Cal.Rptr. at 368] and n. 48, and the historical significance and legal status of education as a "basic and fundamental" state institution, see Horton v. Meskill, 172 Conn. 615, 376 A.2d 359, 373 (1977).
Given the history and text of Alabama's education article, the Court determines that the right to education in Alabama is fundamental under any of these criteria. This right is at least implicitly guaranteedand, at one point in our constitutional history, was explicitly taken awayby the state constitution[50] itself. See Ala. Const. art. XIV, § 256; id., amend. 111.[51] Governor Hunt warns, however, that if the question of whether a right is fundamental turns on its explicit or implicit guarantee in the constitution, this test may sweep too broadly.[52] The Court is not entirely persuaded by this "floodgates" argument; it does not perceive, within the Alabama constitution, a great many rights so positively, clearly, and emphatically guaranteed as to give rise to colorable claims that these are fundamental. However, assuming that an explicit or implicit constitutional guarantee is a necessary, but not sufficient, characteristic of a fundamental right, the Court finds ample additional evidence of the fundamental character of the right to education in the constitution, laws, history, and practice of the state of Alabama.
The 1901 constitution devotes an entire article to public education, and the school laws occupy more than 700 pages of the Code of Alabama. See Laws of Alabama Relating to Education, State Department of Education (1988). The point here, of course, is not the gross number of pages dedicated to schools, but the centrality of public education to the enterprise of the state in Alabama. The preeminence of education is reflected in the state's annual budget, the largest share of which is appropriated for the maintenance of the public schools, and the vast body of state employees at work at this task. "Without question, public education through a system of public schools is, by the Constitution, as well as by statutes, a government function in Alabama; indeed a major activity of state government." Williams, 161 So. at 507 (emphasis added).[53]See also Brown v. Board of *158 Education, 347 U.S. 483, 493 [74 S.Ct. 686, 691, 98 L.Ed. 873] (1954) ("Today, education is perhaps the most important function of state and local governments.") (emphasis added).
As discussed supra, the fundamental character of education in this state has been a prominent theme in all of Alabama's constitutions. See Ala. Const. of 1819, art. VI ("Schools, and the means of education, shall forever be encouraged in this state...."); Ala. Const. of 1861, art. VI (same); Ala. Const. of 1865, art. XI, § 6 (state duty to establish free public schools). The President of the 1875 constitutional convention described education as one of the highest duties of Republican Government. Journal of the Constitutional Convention of 1875 at 5-6. Of the 1875 education clause, State Superintendent of Education John M. McKleroy said: "The principle of the power and propriety of a State to maintain a system of free public education has been affirmed in unmistakable terms by the people of this State, and they have implanted it in the constitution made by themselves, and in the same instrument they have made liberal provisions for its support, thus guaranteeing its permanency and usefulness." S.B. Weeks, History of Public School Education in Alabama at 113 (1915); see also, Palmer Report at xcvi (demand for free public schools so great that their "establishment and maintenance are solemnly enjoined in the fundamental law of the State.")
When concerns again developed about inadequate funding of schools in the years following 1875, many state leaders perceived the need for further constitutional attention to education. See Official Proceedings at 15 ("Nothing has so retarded the rapid growth and development of our State as the absence of a well regulated system of public schools, so as to place within the reach of every child in the State, both rich and poor, the means of obtaining free of tuition fees, such instruction as will qualify him for the responsible duties of life.") (Opening Statement of President John B. Knox). Thus, the task of putting public education on a sound financial and constitutional footing was foremost in the minds of the framers of the 1901 constitution. As delegate William A. Handley put it, "if everything else were to fail, it is the duty of this Convention to take care of the educational interests of the State of Alabama at all hazards." Official Proceedings at 15.
In 1854, when the legislature first established Alabama's statewide system of public schools, see 1853-54 Ala.Acts, No. 6 at pp. 8-18, the committee report accompanying this legislation pronounced that "[t]here can be no doubt that it is the unquestionable right, the highest interest, and the most imperative duty of the State to educate her children." See S.B. Weeks, History of Public School Education in Alabama at 60 (1915) (emphasis added). The legislature in modern times has declared: "Education is fundamental to the development and progress of Alabama and its citizens." Ala.Code § 16-13-61 (emphasis added).[54] Indeed, the legislature in this state has deemed education of such consequence that it has made school attendance compulsory, requiring the sacrifice of individual liberty. Ala.Code § 16-28-1 to 16-28-24.
Public education is the state's chief instrument for stimulating economic growth, fostering civic responsibility, exposing the citizenry to social values, preparing students for professional training, and protecting our democratic form of government. The United States Supreme Court, in Plyler v. Doe, 457 U.S. 202 [102 S.Ct. 2382, 72 L.Ed.2d 786] (1982), summarized the crucial significance of public schools, citing "the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of a child."

*159 The "American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance." "We have recognized `the public schools as a most vital civil institution for the preservation of a democratic system of government,' and as the primary vehicle for transmitting `the values on which our society rests.' `[A]s ... pointed out early in our history, ... some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence.' And these historic `perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists.' In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society."[55]
Id. at 221 [102 S.Ct. at 2397] (citations omitted). These statements clearly hold true in Alabama.
For the foregoing reasons, the Court concludes that education is a fundamental right under the Alabama constitution. Defendant contends, however, that the Supreme Court's holding in San Antonio Independent School District v. Rodriguez, 411 U.S. 1 [93 S.Ct. 1278, 36 L.Ed.2d 16] (1973), that education is not a fundamental right under the federal constitution should control this Court's decision. "While, of course, the decisions of the Supreme Court are justly entitled to great weight, they cannot exert any controlling influence upon the courts of the several states when those courts are proceeding according to their own practice, and within the constitutional limits of their own State Constitution; no federal question being involved." Kraas v. American Bakeries Co., 231 Ala. 278, 164 So. 565, 569 (1935). The question for this Court, self-evidently, is not whether education is a fundamental right under the federal constitution; the question is, instead, the nature of the right to education under the constitution of Alabama.[56] Thus, Rodriguez does not control.
Because education is a fundamental right under the Alabama constitution, the stark inequities in educational opportunity offered schoolchildren in this state must be justified under strict scrutiny by a compelling state interest to pass constitutional muster. While Governor Hunt contends in his briefs that the state's interest in local control justifies the differential treatment complained of by plaintiffs, he does not argue that local control represents a compelling state interest, only a "legitimate state purpose" under rationality review. See Hunt Post-Trial Brief at 17. Nor, for the reasons cited below, does the state's interest in local control satisfy this extremely rigorous standard.[57]
*160 Indeed, the Court cannot conclude that the differential treatment at issue here is rationally related to a legitimate state interest under the least searching tier of equal protection analysis, the rationality standard. See Plitt, 585 So.2d at 1324. As described by the plurality in Moore, the question here is "whether the connection between the benefit sought to be conferred on society and the means employed to accomplish it, when weighed against the inequities created by the statute's classifications, is so attenuated and remote as to constitute an unreasonable exercise of the police power." Moore, 592 So.2d at 167. As discussed supra, the interest in local control asserted by the Governorthat is, local autonomy to secure the level of education that citizens desire for the children in their districtsis actually defeated, rather than promoted, in many poorer school systems in Alabama by differentials in school funding. These systems cannot be said to exercise meaningful choice about the kind of education they desire or dream about for their children; they face, instead, a daily Hobson's choice whether, for example, to do without library books or to leave the roof unmended in order to meet the budget. See Horton, 376 A.2d at 373 (the option of local control "to a town which lacks the resources to implement the higher quality educational program which it desires and which is available to property richer towns is highly illusory."); see also Serrano II, [18 Cal.3d 728] 557 P.2d at 953 [135 Cal.Rptr. at 368]. "The poor district cannot freely choose to tax itself into an excellence which its tax rolls cannot provide. Far from being necessary to promote local fiscal choice, the present system actually deprives less wealthy districts of that option.").[58]
Thus, the Court holds that the differential treatment in question cannot be sustained under the rational relationship test as a permissible, or even effective, means of promoting local control. Further, the Court cannot conceive any rational justification, educational or otherwise, for school funding and educational opportunity to depend upon the happenstance of local wealth and of students' places of residence.[59]See Horton, 376 A.2d at 373 ("With justification, the trial court found merit to the complaints of plaintiffs about `the sheer irrationality' of the state's system of financing education in the state on the basis of property values, noting that their argument "would be similar and no less tenable should the state make education expenditures dependent upon some other irrelevant factor, such as the number of telephone poles in the district.") (citation omitted). Finally, in this regard, the Court also cannot sustain a school finance system that all parties agree is irrational in the details of its actual operation.[60] This is particularly true where, as here, the state's countervailing interest in providing all its citizens with a quality education *161 is so compelling. See Johnston, Turner speech at 23 (the state `has a vital interest in each citizen, in his morality, his intelligence and his capacities[;] as the average intelligence rises, the value of citizenship increases.")
Accordingly, the Court holds that no matter what standard of equal protection review is employed, the present system of public schools in Alabama violates the constitution of Alabama, article I, §§ 1, 6, and 22.
Plaintiffs have also raised, but not argued, a claim that disparities in educational opportunity in Alabama's system of public schools violate the equal protection clause of the federal constitution. Because the Court holds that such disparities are impermissible under the Alabama constitution, and because plaintiffs have not argued this claim, the Court does not reach this issue.

DUE PROCESS
In addition to their adequacy claim under Section 256 of the Alabama constitution, plaintiffs maintain that Alabama's public school system violates their right to an adequate education under the due process guarantees of Art. I, §§ 6 and 13 of the Alabama constitution and the due process clause of the fourteenth amendment of the U.S. Constitution. It is well-established that the Alabama constitution protects the right of Alabama citizens to due process, apart from any protection they may have under the federal constitution. See, e.g., McCollum v. Birmingham Post Co., 259 Ala. 88, 65 So.2d 689, 695 (1953) (Alabama constitution due process provision "secures every citizen against arbitrary action of those in authority and places him (or her) within the protection of the law of the land.")[61] It is well-settled in this state that when the state deprives citizens of liberty for the purpose of benefiting them with a service, due process requires that the service be provided to them in an adequate form. See Wyatt v. Stickney, 325 F.Supp. 781 (M.D.Ala.1971), aff'd in part and reversed in part, Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir.1974). In Wyatt, the courts recognized that due process requires that patients hospitalized in Alabama's mental institutions be given adequate treatment in exchange for the liberty that they give up when they are institutionalized. Id.
The state of Alabama deprives students of their liberty by requiring them to attend school under penalty of law. Governor Hunt has conceded that compulsory education places a limitation on individuals' liberty. See Hunt Deposition at 102. Just as providing treatment is the purpose of committing persons to mental hospitals, the purpose of depriving students of their liberty by mandating school attendance is to educate them. See, e.g., Ogle v. Ogle, 275 Ala. 483, 156 So.2d 345 (1963).[62] It would be a tragic mistake to deny that Alabama's schoolchildren have the same type of right to services adequate to meet the purposes of their confinement that Wyatt held mentally ill and mentally retarded persons are entitled to by due process.[63] Governor Hunt acknowledged in deposition testimony, and the Court agrees, that compulsory attendance places a limitation on individuals' liberty and thus, as a matter of fairness, the state ought to have to provide *162 an adequate education. See Hunt Deposition at 102.
Plaintiffs have made a clear showing in this case that the education that they are receiving is not adequate; it falls short in facilities, staff, curriculum, textbooks, supplies, special education, and other areas. Just as a course of treatment that falls short of adequacy fails to justify state deprivation of the liberty of the mentally ill, the inadequate education that plaintiffs are receiving does not justify the deprivation of their liberty. If the state is to continue to make education compulsory and, thereby, to deprive children of their liberty, due process requires that those children be accorded an adequate education.
In addition, Alabama schoolchildren have a due process property interest or entitlement with respect to public education under Alabama law. See Smith v. Dallas County, 480 F.Supp. 1324, 1337 (S.D.Ala.1979). As the Fifth Circuit explained in Debra P. v. Turlington, 644 F.2d 397, 404 (5th Cir.1981), once a state establishes a system of education and requires school attendance, an "understanding" is created between the state and the student "that secures certain benefits and that supports claims of entitlement to those benefits." Id. at 404.[64] The contours of plaintiffs' due process property interest in this case are evidenced in state law in terms of the standards or requirements set forth by the Alabama constitution and state laws and regulations governing public education. Again, the Court agrees that plaintiffs have shown that in many cases they are being deprived of an education that even comes close to meeting these standards or requirements.
Governor Hunt argues that plaintiffs are not being deprived of a due process property interest because the Alabama constitution "grants only the right to attend a free public school." Hunt Post-Trial Brief at 19. But the Court is convinced that the text of the constitutional right guaranteed by the Alabama constitution's education clause and its history refute this narrow interpretation and that Alabama laws and regulations governing public education likewise support a broader entitlement to public education. Section 256 mandates a "liberal system of education," one that is generous and bountiful in its provision of educational opportunity; the right that is protected is to an adequate educationnot merely a right to "attend a free public school." Plaintiffs have established that many Alabama schoolchildren are deprived of their state law entitlement to public education arbitrarily and without any constitutionally sufficient justification in violation of due process.

SPECIAL EDUCATION CLAIMS
With regard to the Doe plaintiffs' claims, the Court emphasizes that schoolchildren with disabilities have the same constitutional right to an equitable and adequate education as all other schoolchildren in Alabama. In addition, however, the sub-class represented by John Doe asserted two additional claims unique to children with disabilities: (1) that children with disabilities are deprived of their statutory right under Ala.Code §§ 16-39-3 and 16-39A-2 to an appropriate education and special services, and (2) that the Alabama system of funding for special education is irrational and violates the due process clause of the Alabama constitution. As discussed below, the Court rules in favor of the Doe plaintiffs on both claims.
The sub-class argues that Alabama law[65] entitles children with disabilities to an appropriate education. Since this is a case of first impression, the Court must decide if the statute obligates the state to educate children in special education programs appropriately. As noted earlier, the focus of the *163 Court's examination must be on the intent of the legislature. The first step is to look at the text of the statutes.
The statutes require that: "Each school board[66] shall provide not less than 12 consecutive years of appropriate instruction and special services for exceptional children." Ala.Code § 16-39-3. "All county and city local education agencies are required to provide free appropriate public education for all eligible children with disabilities." Ala.Code § 16-39A-2. According to the plain meaning of the statutes, children with disabilities have a right to appropriate instruction and special services. Defendants have cited no authority to the contrary. Therefore, the Court rules that Alabama statutes require the state to provide an appropriate education and special services to children with disabilities.
Next, the Doe plaintiffs assert that the term "appropriate" defines a specified level of quality in education. Although there are no reported state court cases interpreting the term "appropriate" in this context, the sub-class argues that federal cases construing this word have been adopted by the state. After considering the circumstances surrounding passage of both statutes and the testimony of Dr. Kenneth Wilson, the Court agrees.
Before enactment of Act 106 in 1971, a school board was permitted to exempt children with disabilities from mandatory school attendance. 1947 Ala.Acts, 676 at 517. At that time, it was common to exclude disabled school-aged children from educational requirements. Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley, 458 U.S. 176, 180 [102 S.Ct. 3034, 3037, 73 L.Ed.2d 690] (1982). Concerned about this practice, Congress enacted a federal grant program, The Education of the Handicapped Act, to encourage the education of children denied an education. See P.L. 91-230, 84 Stat. 1204. Observing little progress in education of the handicapped, Congress later adopted The Education For All Handicapped Children Act in 1975 (the "EHA"). See 20 U.S.C. §§ 1400 et seq.[67]
In order to receive federal funds available under the EHA, Alabama must have in effect a policy guaranteeing children with disabilities a "free appropriate public education." See 20 U.S.C. § 1412(1). To carry out this task, Alabama has adopted the language used in federal lawan "appropriate" education. Dr. Kenneth Wilson testified that, for the most part, state regulations mirror the language of the federal law. The Court cannot construe the Alabama statutory and regulatory language differently from the federal meaning without ignoring the clear intent of the Alabama legislature to benefit from federal aid to special education.
This conclusion is bolstered by the recent adoption of the Special Education of Preschool Handicapped Children Act. See Ala. Code § 16-39A-1 to 16-39A-3. The Act expressly incorporates the federal definition of a free appropriate public education as "[t]hat program as defined by federal statute under Public Law 91-230 [the original EHA], and all regulations and amendments thereto." Ala.Code § 16-39A-3(4). It is clear that the legislature intended the term "appropriate" in the Alabama statutes to have a meaning identical to the same language in the federal law.
The next step is to examine federal law for the meaning of an appropriate education. In Rowley, the United States Supreme Court articulated a test to determine if a child is receiving an appropriate education. A child with disabilities is receiving such an education if the program is composed of specialized *164 instruction and related services which are individually designed to provide educational benefit to the child with disabilities. Rowley, 458 U.S. at 201 [102 S.Ct. at 3048]. Several of plaintiffs' witnesses, including Dr. Wayne Teague, Mr. Barry Blackwell, Dr. Martha Snell, and Dr. David Rostetter, testified that Alabama fails to meet this standard.
Alabama's system of special education does not and cannot provide an appropriate education to children with disabilities. Virtually all the testimony of the sub-class' witnesses catalogued deficiencies in the state's provision of instruction and services. To reiterate only the most obvious, the Court notes Mr. Blackwell's testimony that some school systems do not offer certain programs to children with disabilities because they lack the staff qualified to teach students with some disabilities. Further, Dr. Rostetter pointed out that the problem is statewide because Alabama cannot give local school systems the support needed to hire, train, and retain qualified staff. Alabama's inability to provide any services to children with certain identified disabilities and the other deficiencies noted in the findings of facts clearly fail to meet the Rowley test.
The sub-class also argues that Alabama's system of funding special education violates the due process clause of the Alabama Constitution. See Ala. Const. art. 1 §§ 6 and 13. Under the state due process clause, the funding scheme must be reasonable and bear a substantial relationship to the public need. Baldwin County Board of Health v. Baldwin County Electric Membership Corp., 355 So.2d 708, 710 (Ala.1978). The total enrollment method of funding special education is based entirely on the total number of students in regular and special education. Because the funds available per special education pupil are not tied to the cost of educating those pupils, the system penalizes school systems which try to serve all children with disabilities. As the number of special education students increases, the money per pupil decreases. The Court concludes that such a scheme is irrational and has no relationship to the public interest in appropriately educating students with disabilities.
Further, the argument that a change in the system of funding to a weighted child count method moots this issue is not persuasive. The state may again alter the method of funding education if the weighted child count system is unsatisfactory. In addition, since the weighted child count system is not fully implemented and in use in Alabama, it is impossible to determine whether this method will result in a constitutional funding scheme. The public interest at stake and the rights of children with disabilities justify relief in this case. See Payne v. J.T.N., 568 So.2d 830, 831 (Ala.Civ.App.1990). The Court rules that the total enrollment method of funding special education is irrational and arbitrary in violation of the due process clause of the Alabama constitution.
Governor Hunt does not argue that the Doe plaintiffs' interpretation of the Alabama statutes' definition of an appropriate education is incorrect. Instead, the defendant attacks the sub-class's method of challenging the state system of funding special education. The Governor maintains that the proper vehicle for enforcing the right to an appropriate education is by administrative remedy, or, in the alternative, by petitioning the state attorney general to file suit. For the reasons outlined below, the Court rejects both these arguments.
The requirement of exhaustion of administrative remedies applies to individual children seeking relief under the federal EHA. See Smith v. Robinson, 468 U.S. 992 [1015-16 n. 17], 104 S.Ct. 3457, 3470-71 n. 17 [82 L.Ed.2d 746] (1984). However, the sub-class advances its claim on behalf of all children with disabilities solely under Alabama statutes. The administrative actions designed to provide redress of federal rights for individual schoolchildren do not apply in a challenge to statewide funding and systemic inequities. Further, a series of individual suits could exacerbate the educational disparities by diverting already scarce resources to educate those children with the means to bring administrative actions. Finally, it is axiomatic that when, as here, the exhaustion of administrative remedies would be futile in attempting to remedy a systemic deficiency, an exhaustion requirement does not apply. See *165 Smith v. Robinson, 468 U.S. 992 [1015-16 n. 17], 104 S.Ct. 3457, 3470-71 n. 17 [82 L.Ed.2d 746] (1984).
Defendant Hunt also argues that the sole remedy under state law is suit by the Alabama attorney general. Act 106 allows an exceptional child to petition the attorney general for assistance in enforcing the right to an appropriate education. See Ala.Code § 16-39-4. However, nothing in the statutes or regulations suggests that this is the exclusive method of enforcing the right to an appropriate education. The Court is unwilling to condition the exercise of that right on an enforcement mechanism that could be construed as a limitation on access to the courts. Further, Act 106 gives no indication that the assistance of the attorney general is required in order to challenge a systemic deficiency such as the entire special education funding scheme under the Alabama constitution. Therefore, the Court rules that when exhaustion of administrative remedies would clearly be futile, a class of aggrieved special education students may properly bring suit in state court to remedy systemic deficiencies in special education without the assistance of the attorney general.

INDEPENDENT AND ADEQUATE STATE GROUNDS
Each of the state law holdings in this decision "rest[s] on an adequate and independent state ground." Michigan v. Long, 463 U.S. 1032, 1044 [103 S.Ct. 3469, 3478, 77 L.Ed.2d 1201] (1983). The Court's holding that § 256 of the Alabama constitution guarantees schoolchildren equitable and adequate education is based on the unique text and history of that provision. The holding that plaintiffs are deprived of their rights to equal protection and due process rest on this Court's interpretation of the appropriate provisions of the Alabama constitution.[68] This Court's interpretation of those provisions was not "compelled by federal constitutional considerations," id. at 1045 n. 10 [103 S.Ct. at 3479], but rather is based on the text and history of the Alabama constitution and case law interpreting it. The statutory rights found by the Court exist in Alabama law independent of any federal statutes. Although this decision in places refers to federal case law, as it does to cases from states other than Alabama, none of those decisions is necessary to the Court's analysis or compels the results reached.

CONCLUSION
The Court is mindful of the importance of this case. In reaching its decision, the Court has carefully considered the delicate balance among the three departments of state government under the doctrine of separation of powers, all of the evidence relevant to resolve the important constitutional issues presented by competent counsel for all parties involved, as well as their arguments and written briefs. The defendant, Governor Hunt, through his counsel, has admitted that deficiencies exist in Alabama's public school system and that additional funds are needed to remedy some of the unsatisfactory conditions. The real issue here is whether these deficiencies and conditions rise to the level of deprivations of constitutional and statutory rights. In the opinion of the Court, they do.
Therefore, it is ORDERED, ADJUDGED and DECREED as follows:
1. That, pursuant to Ala. Const. art. I, §§ 1, 6, 13 and 22 and art. XIV, § 256, Alabama school-age children, including children with disabilities, have and enjoy a constitutional right to attend school in a liberal system of public schools, established, organized and maintained by the state, which shall provide all such schoolchildren with substantially equitable and adequate educational opportunities;
2. That the essential principles and features of the "liberal system of public schools" required by the Alabama Constitution include the following:
*166 (a) It is the responsibility of the state to establish, organize, and maintain the system of public schools;
(b) the system of public schools shall extend throughout the state;
(c) the public schools must be free and open to all schoolchildren on equal terms;
(d) equitable and adequate educational opportunities shall be provided to all schoolchildren regardless of the wealth of the communities in which the schoolchildren reside; and
(e) adequate educational opportunities shall consist of, at a minimum, an education that provides students with opportunity to attain the following:
(i) sufficient oral and written communication skills to function in Alabama, and at the national and international levels, in the coming years;
(ii) sufficient mathematic and scientific skills to function in Alabama, and at the national and international levels, in the coming years;
(iii) sufficient knowledge of economic, social, and political systems generally, and of the history, politics, and social structure of Alabama and the United States, specifically, to enable the student to make informed choices;
(iv) sufficient understanding of governmental processes and of basic civic institutions to enable the student to understand and contribute to the issues that affect his or her community, state, and nation;
(v) sufficient self-knowledge and knowledge of principles of health and mental hygiene to enable the student to monitor and contribute to his or her own physical and mental well-being;
(vi) sufficient understanding of the arts to enable each student to appreciate his or her cultural heritage and the cultural heritages of others;
(vii) sufficient training, or preparation for advanced training, in academic or vocational skills, and sufficient guidance, to enable each child to choose and pursue life work intelligently;
(viii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in Alabama, in surrounding states, across the nation, and throughout the world, in academics or in the job market; and
(ix) sufficient support and guidance so that every student feels a sense of self-worth and ability to achieve, and so that every student is encouraged to live up to his or her full human potential.
3. That, pursuant to Ala.Code § 16-39-3 and 16-39A-2, Alabama schoolchildren with disabilities aged 3-21 have the right to appropriate instruction and special services;
4. That the present system of public schools in Alabama violates the aforestated constitutional and statutory rights of plaintiffs;
5. That the state officers[69] charged by law with responsibility for the Alabama public school system, are hereby enjoined to establish, organize and maintain a system of public schools, that provides equitable and adequate educational opportunities to all school-age children, including children with disabilities, throughout the state in accordance with the constitutional mandates of Ala. Const. art. XIV, § 256; art. I, §§ 1, 6, 13 and 22; and to provide appropriate instruction and special services to children with disabilities aged three through twenty-one pursuant to Ala.Code §§ 16-39-3 and 16-39A-2;
6. That this matter is set for status conference on 9th day of June, 1993, at 8:30 a.m. for the purpose of establishing the procedures and timetable for determination of an appropriate remedy in this case.
*167 DONE on this the 31st day of March, 1993.
 /s/ Eugene W. Reese
 EUGENE W. REESE
 CIRCUIT JUDGE
NOTES
[1] The plaintiff school systems are: Barbour, Butler, Clarke, Coosa, Crenshaw, Geneva, Hale, Lawrence, Lowndes, Macon, Pickens, Pike, Winston, Greene, Bullock, Conecuh, Henry, Limestone, Perry, Walker, Wilcox, Chambers, Talladega, and Dallas County Boards of Education and the Troy City Board of Education.
[2] Judge Mark Montiel was originally assigned to hear this action. The case was reassigned to this Court in January, 1991.
[3] The Court will, in this opinion, typically use "defendant" in the singular and, by that term, refer primarily to Governor Hunt. The finance director also remains a defendant in this lawsuit, but he has not assumed an active role at trial. The Court assumes that the finance director adopts the positions taken by Governor Hunt.
[4] Although two consolidated actions are before the Court, this opinion uses the term, "case," "action," "suit," etc., for convenience.
[5] Defendant Hunt maintains that plaintiffs complain only about inequitable and inadequate school funding. See Pre-trial Brief of Governor Guy Hunt (hereinafter, Hunt Pre-Trial Brief) at 5. The Court finds, however, that while school funding is a major focus of plaintiffs' case, the issues raised go to the broader question of the educational opportunities offered to Alabama's schoolchildren in the form of educational facilities, programs and services.
[6] As used in this order and opinion, the terms schoolchildren and students mean all school-age children in Alabama, including those with disabilities.
[7] Defendant Hunt also argues that the state cannot afford substantially increased school funding, and that increased funding would not necessarily result in improvement in student performance. These matters, although more relevant to the question of remedy than to the constitutionality of the present system, are also addressed below.
[8] The Doe plaintiffs also join in the ACE and Harper claims.
[9] Governor Hunt himself has described the educational opportunity that the school system must provide as one designed "[t]o give every student... the opportunity to learn to the very limit of their intellectual ability." Deposition of Governor Guy Hunt (hereinafter, Hunt Deposition at 72).
[10] Those systems in 1990-91 were Mountain Brook (3,294 students), Hoover (2,062 students), Huntsville (24,028 students) and Sheffield (1,548 students).
[11] Dr. Alexander determined, for fiscal year 1989-90, the five wealthiest systems were Mountain Brook, Homewood, Hoover, Houston and Huntsville, and the five poorest systems were Thomasville, Elba, Piedmont, Linden and Winfield. Dr. Alexander and Dr. Goertz measured the wealth of school systems using a combination of 100 percent equalized assessed value of property per average daily attendance and total personal income per average daily attendance. Defendant did not dispute the validity of this measurement.
[12] The Court also heard no evidence that non-instructional federal aid typically pays for school facilities or maintenance.
[13] The classroom measurement used by Dr. Goertz was 22.8, the average number of students she found to be served by a regular program teacher.
[14] Some of the states that defendant compares with Alabama also have many more local school districts than does this stateMichigan has 619 school districts, for example, while Alabama has only 129. Testimony at trial indicated that states with relatively high numbers of school districts may be likelier to include small enclaves of exceptional wealth, which attenuate disparities further.
[15] As Dr. Wolkoff admitted at trial, disparities in Alabama's public school funding exceed those deemed acceptable under Federal standards. See 34 C.F.R. § 222.63 (1989).
[16] Testimony suggesting that Wilcox County, a poorer, majorityblack school system, has wasted money by building a swimming pool in its new high school is clearly insufficient alone to condemn all poorer systems. Further, the Court is not in any case inclined to find that a swimming pool is wasteful in a poorer system as long as wealthier systems are not censured for building such facilities. Although Dr. Eric Hanushek did offer more systematic testimony for defendant concerning inefficiency (defined narrowly as waste in producing improved test scores) in Alabama schools, which is discussed further below, he did not attribute such inefficiency to the poorer systems.
[17] A "mill" of tax is equivalent to ten cents of every one hundred dollars of assessed property value. "Millage" rates represent the number of mills of tax collected in a given community.
[18] For example, Dr. Alexander testified that Homewood, a wealthier system, needs only a tax of .45 mills to finance one classroom, whereas a low wealth system like Carbon Hill would have to tax itself at more than ten times that rate, or 5.6 mills, to raise the same amount of money.
[19] Tax effort was defined as the state and local revenue of a school system divided by equalized assessed value of property and personal income.
[20] Dr. Alexander testified that he found a positive correlation between revenue and wealth of.759that is, 57 percent of the variation in school revenues was attributable to wealth, a correlation that he termed "highly significant." Dr. Goertz testified that she also found a distinct relationship between the revenues available per pupil and the wealth of a local school system.
[21] Governor Hunt himself has called this funding formula "hopelessly out-of-date" and "too arbitrary." Hunt Deposition at 92.
[22] Dr. Wolkoff testified on behalf of Governor Hunt that state and local funds, taken together, exhibit less extreme variation among school systems than do local funds alone. But to draw this conclusion, which plaintiffs do not dispute, is not the same as to say that state funding actually has an equalizing or even a neutral effect overall in the present school finance system.
[23] The more affluent systems selected for the study were Hoover, Mountain Brook, Homewood, Opelika, Vestavia, Dothan, Muscle Shoals, and Huntsville; the lower wealth systems were Butler County, Hale County, Bibb County, DeKalb County, Perry County, Dallas County, Wilcox County and Lowndes County. Muscle Shoals, also a high wealth system, refused to participate in the study.
[24] Children with disabilities receive minimum program fund money just as do their nondisabled peers.
[25] State accreditation here refers to approval under the "old" Alabama accreditation system. The Department of Education has adopted a new system of school accreditation, Performance-Based Accreditation, but that system has not been fully implemented because it has not been funded.
[26] The Alabama Department of Education recognizes the value of Southern Association accreditation by including it in annual status reports on the Alabama school system, in addition to state accreditation. Annual Status Reports are documents produced annually by the State Department of Education that report a variety of kinds of data on each of the 129 Alabama school systems.
[27] The Alabama Education Improvement Act of 1991 amended Ala.Code §§ 16-3-1, -15; §§ 16-23-3, -14, -15, & -16; and § 16-28-4; and repealed §§ 16-40-2, -3, -4, -5.1, -5.2, -5.3, -5.4, -6, & -7. Section 25 provides that the Act's provisions are mandatory "only to the extent that funds are appropriated or otherwise made available for the purposes of implementing such mandate." 1991 Ala.Acts 323 at 642.
[28] Dr. Anita Buckley-Commander testified at trial that, after hearing about Alberta Elementary's condition during the course of this trial and then going to see it for herself, she was so moved by the poor conditions that prevail there that she is working to secure new playground equipment for the school. There is no evidence in the record as to whether any new playground equipment has in fact been installed at the school.
[29] In addition to testimony heard at trial, testimony by affidavits from Linda Albritton, James H. Beardsley, Teresa Beardsley, Juanita Brown, Dinesha Carter, Ethel M. Dasis, John M. Dasis, Dr. Cheryl Deaton, Mary Ann Ezell, Mary Fields, Mary Harper, Marjorie Freyer, Andra Johnson, Carrie Lewellen, Frizzette LaDrell Lyles, John Pratt, Gay B. Slay, Thad Eugene Slay, Jeanie Ward, Marvin Key Warren, Ada Phillips, Carol Damsky, Lisa Preston, and Nancy Large tell similar stories about a wide range of shortcomings in facilities, staff, curriculum, and other areas in schools in Tuscaloosa City, Wilcox County, Dallas County, Choctaw County, Bibb County, Marengo County, and other Alabama school systems. These affidavits were admitted into evidence in lieu of trial testimony by consent of the parties.
[30] Equal access means that "no student will be denied access to a broad and varied educational program because of his/her assignment to a particular school or classroom." See Performance at 4D (Definitions).
[31] Dr. Flynt testified that 65 percent of food stamp recipients, 70 percent of Medicaid recipients and 90 percent of state prisoners in Alabama are not high school graduates.
[32] Other similar comments about the adequacy of Alabama's educational system may be found in the Governor's deposition. See Hunt Deposition at 55-56 (the system is "fundamentally flawed"); id. at 52-53 (the Alabama school system is failing its students, and for that reason is inadequate); id. at 52 (Alabama schools are not performing up to the level that the future demands); id. at 54 (reforms are necessary in the Alabama education system for the children of Alabama to receive an adequate education).

At trial, the Governor's chief education advisor, Dr. Buckley-Commander, also did not defend the adequacy of the Alabama school system. She agreed that Alabama schools are not providing an adequate education, that there are school facilities that are not conducive to learning, and that Alabama schools need more money.
[33] An education production function study seeks to quantify the relationship between educational inputs (funding, teacher student ratios, etc.) and educational outputs (student test scores, graduation rates, etc.).
[34] The Court notes in this regard that when Dr. Ferguson reanalyzed the Hanushek data using actual rather than average test scores, he found a statistically significant positive correlation between expenditures and achievement.
[35] Interestingly, Governor Hunt himself has said that Alabama public schools need more money.
[36] Dr. Rostetter has also supervised or personally reviewed the special education programs in all 50 states. He wrote the manual used by the federal government in monitoring state special education programs.
[37] In 1896, Superintendent of Education John O. Turner declared, in advocating strong constitutional support of education, that "[t]he only way to make Alabama able to support a public school system is to educate her people and they will become prosperous. This will have to come first, poverty or no poverty." Superintendent John O. Turner, "Speech Before the Southern Education Association," Annual Session 1896, Mobile, Alabama, December 30, 1896. At the 1901 constitutional convention itself, convention president John B. Knox said: "[I]t will not do to say you are too poor to educate the peopleyou are too poor not to educate them." Opening statement of President John B. Knox, Official Proceedings of the Constitutional Convention of 1901 at 15.
[38] See also Opinion of the Justices, 263 Ala. 158, 81 So.2d 881, 888 (1955) ("[C]onstitutions are made for practical purposes and look to practical ends, and in the construction of them, we are to take into consideration the conditions which confronted the constitutional makers, and, if possible, give the instrument such construction as will carry out the intention of the framers ...")
[39] The Court will analyze the question of whether this right is a "fundamental" right for equal protection purposes, infra.
[40] Governor Hunt appears to agree that § 256 guarantees children of school age at least some kind of constitutional right, although he reads the right at issue narrowly. See Hunt Post-trial Brief at 22 (§ 256 is the source of a "constitutional right of Alabama citizens to be educated in a state-funded school.").
[41] This, of course, was done for racial reasons which compelled the invalidation of the amendment.
[42] Interestingly, one federal district court concluded that Alabama's constitution "provides all children with an entitlement to a public education," even with Amendment 111 still in effect. See Smith v. Dallas County, 480 F.Supp. 1324, 1337 (S.D.Ala.1979) (citing art. XIV, § 256, only).
[43] This article provided: "The General Assembly shall establish, organize, and maintain a system of public schools throughout the state, for the equal benefit of the children thereof, between the ages of seven and twenty-one years...." 1875 Ala. Const., art. XIII.
[44] "When words and phrases are employed which have acquired a defined popular signification, the manifest inference is that they are used in their known and defined meaning and sense, no intention being apparent, from the nature and manner of use or otherwise, to attach any other signification. In order to give the terms employed such operation and force, according to their legitimate meaning as generally and ordinarily understood, so as to fully accomplish the object intended, resort may properly, and should, be had to the history of the subject of the constitutional provision, especially in reference to the preceding state constitutions and legislation, and to the condition of the subject at the time of the adoption of the constitution under construction. Elsberry, 3 So. at 805.
[45] The Governor also argues that "[i]f educational equity had been the goal of the delegates to the 1901 constitution, they would have stated that goal with greater clarity." See Hunt Post-trial Brief at 29. However, the Elsberry decision is clear that the equitable aims of the constitutional system of public schools were commonly understood, so this Court looks only for some textual or interpretational change that would indicate a departure from that understanding.
[46] One group at the convention argued that state school funds should be divided among white and black children according to how much in taxes each race paid, a system with clearly unequal funding consequences. See 2 Official Proceedings of the Constitutional Convention of the State of Alabama (hereinafter, Official Proceedings ) at 1607-08. Apparently in response to concern that such a division would not survive federal equal protection scrutiny, "equal" was removed from the constitution as a modifier for "benefit," but "school terms of equal duration," were guaranteed for both races. See id. at 203, 2033-41. This provision, although not strictly equal, was "equitable" (and, therefore, constitutional), some argued, because "[t]here [was] no necessity for paying a teacher for a colored school the same amount you pay to white school teachers, because you get them at much less salary. Under the present laws of Alabama, if the law is carried out, the colored pupil gets the same amount of money per capita as the white pupil, and that is not justice." Id. at 1608. Thus, perversely, there is a sense in which the removal of "equal"which was thought to compel equal expenditures despite unequal costsin favor of the requirement of equal school terms, can be read to restore rather than to remove a requirement of equity from this clause.
[47] Of course, this Court cannot today give effect to any racial limitation on the equality of educational opportunity promised by § 256.
[48] The case of Vincent v. County Board of Education, 222 Ala. 216, 131 So. 893 (1931), is not to the contrary. In Vincent, the Alabama Supreme Court interpreted the word "liberal" to mean "generous and bountiful" and declared that: "No doubt a liberal system of public education will be so framed as to give every child between the ages of seven and twenty-one years a chance." The schools that plaintiffs now attend are not generous or bountiful in their provision of opportunity and do not give them a fair chance at success in later life.

The Vincent Court stated that "when details of school management are considered, something must be left to legislative discretion," and indeed a considerable amount must be. But the legislature may not, any more than any other governmental actor, utilize its discretion to deprive plaintiffs of their rights. It does not detract from the legislature's legitimate discretion to hold, as this Court does, that it cannot be exercised to deprive Alabama schoolchildren of an adequate and equitable education.
[49] See also Lujan v. Colorado State Board of Education, 649 P.2d 1005, 1016 n. 11 (Colo. 1982) ("State courts are, of course, free to consider the merits of a constitutional challenge under their own constitutional provisions, and they are free to do so independently of United States Supreme Court opinions....") (citing Cooper v. California, 386 U.S. 58 [87 S.Ct. 788, 17 L.Ed.2d 730] (1967)).
[50] The Court does not regard the location of this rightwhether in the Article I declaration of rights, or in an entirely separate article (art. XIV) devoted exclusively to educationin the constitution as material, despite the Governor's contention to the contrary. See Edmonson v. Brewer, 282 Ala. 336, 211 So.2d 469, 475 (1968). In any event § 36 of the Declaration of Rights, expressly states that, "[t]his enumeration of certain rights shall not impair or deny others retained by the people...."
[51] The Governor's own Education Study Commission expressed its conviction in 1991 that if Amendment 111 were repealed, public education would be restored as a "fundamental right."
[52] As an example, Governor Hunt suggests that Ala. Const. Amend. 509, which designates English as the official language of the state of Alabama, might give rise to a fundamental right to sue to enforce this amendment. See Hunt Pre-trial Brief at 13. This amendment confers standing for enforcement upon residents and those doing business within the state, and directs legislative enforcement "by appropriate legislation," providing that state officials "shall take all steps necessary to insure" that the role of English as the common language of the state of Alabama is preserved and enhanced. Id.
[53] Governor Hunt argues that education cannot be a fundamental right under the Alabama constitution because it is not an "essential government function" under Section 19 of the Budget and Financial Control Act of 1932. See Abramson v. Hard, 229 Ala. 2, 155 So. 590, 599 (1934). However, the question of whether education is constitutionally fundamental does not depend upon whether or not public school appropriations were held to be subject to proration under a budget statute, in a case decided by five members of the bar sitting as a special court in which neither § 256 nor equal protection claims were raised.
[54] Governor Hunt has agreed that Alabama's future depends upon education and that it is "fundamental." See Hunt Deposition at 25, 33.
[55] The Plyler Court also said: "`[E]ducation prepares individuals to be self-reliant and self-sufficient participants in society.'" Id. [457 U.S.] at 222 [102 S.Ct. at 2397.] "The public schools are an important socializing institution, imparting those shared values through which social order and stability are maintained." Id. at n. 20. "What we said 28 years ago in Brown v. Board of Education ... still holds true:

'Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."
Id. at 222-223 [102 S.Ct. at 2397-2398] (citations omitted).
[56] Other state courts have read Rodriguez not to be dispositive under state equal protection guarantees. E.g., Washakie County School Dist. No. 1 v. Herschler, 606 P.2d 310, 333 (Wyo.1980); Horton v. Meskill, [172 Conn. 615] 376 A.2d 359, 373 (1977).
[57] As the author of a leading casebook on constitutional law has put it, strict scrutiny is generally "`strict' in theory and fatal in fact." Gunther, Cases and Materials on Constitutional Law (10th edition 1980) at 671.
[58] Further, although the Court agrees with Governor Hunt that local control is presumptively a legitimate state interest, too often in Alabama local control has actually been synonymous with local discrimination. Plaintiffs showed that in some parts of the state, white flight from school desegregation has siphoned support from the public schools. Parents and other promoters of all-white private academies, which were often begun with the state's assistance in defiance of the Supreme Court's desegregation mandate, see, e.g., Lee v. Macon County Board of Education, 267 F.Supp. 458, 461 (M.D.Ala.) aff'd 389 U.S. 215 [88 S.Ct. 415, 19 L.Ed.2d 422] (1967), have campaigned against public school taxes and successfully resisted efforts to improve the public schools. Given the state's role in fostering polarization along racial lines in these school systems, it cannot now wash its hands and abandon public schools to unfettered local control not friendly to their interests.
[59] Governor Hunt agreed in his deposition that educational opportunities provided to school age children in Alabama should be entirely unrelated to the place of residence of the child. Hunt Deposition at 10.
[60] Dr. Harvey testified for plaintiffs that the Minimum Program Fund and other state appropriations for education today accomplish the opposite of what was originally intended, see supra, and that the school funding system is entirely irrational and arbitraryfrom its use of the 1938 assessed property valuation to determine required local effort, to the failure to use up-to-date census counts for Public School Fund allocations, to the use of outdated wealth indices in the Minimum Program Fund calculations. For his part, Governor Hunt has admitted that the school funding formula is hopelessly out-of-date and too arbitrary in the sense that it lacked reasonable or rational basis. Hunt Deposition at 92.
[61] Moreover, the Alabama Supreme Court has expressly adopted a standard of "more rigorous judicial scrutiny" in state substantive due process review than that applied under the federal due process clause. See, e.g., Mount Royal Towers, Inc. v. Alabama State Bd. of Health, 388 So.2d 1209 (Ala.1980).
[62] Likewise, just as the existence of private psychiatric facilities does not affect the state's obligations to mentally ill patients confined to state hospitals, the fact that Alabama's compulsory attendance law permits (if certain criteria are met) attendance at private schools does not relieve the state of its duty to provide an adequate education to children who attend public schools.
[63] The recent opinion in D.R. v. Middle Bucks Area Voc. Tech. Sch., 972 F.2d 1364 (3rd Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1045 [122 L.Ed.2d 354] (1993) (en banc) refusing to impose an affirmative due process duty upon schools to protect students against harm inflicted by private actors is inapposite to the stark situation presented in this case where the harm suffered by Alabama schoolchildren is being inflicted by the state itself. The Third Circuit distinguished the case before it from a case involving a violation by state actors, "since the Due Process Clause itself imposes limitations on the state's conduct." Id. at 1376.
[64] Although the Smith and Debra P. cases were decided under the federal constitution, this Court's reading of the Alabama constitution's due process provision leads it to the conclusion that this provision also protects the property interest in education and that it entitles Alabama students to the benefit of an adequate education.
[65] The two statutes are the Education of Exceptional Children Act, Ala.Code §§ 16-39-1 to 16-39-12, often referred to as Act 106, and the Special Education of Preschool Handicapped Children Act, Ala.Code §§ 16-39A-1 to 16-39A-3. Act 106 also provides for the education of gifted children.
[66] Although the statutes are addressed to local boards, the Court is persuaded that the ultimate authority and responsibility for provision of special education services lies with the state. These services are provided in the state system of Alabama public schools. See discussion of state responsibility supra. See also Ala.Admin.Code, Part B of the Individuals with Disabilities Education Act (IDEA) Application for FY 92-94, Part I, Right to Education Policy Statement.
[67] Congress changed the name of the EHA to the Individuals with Disabilities Education Act in 1990. See P.L. No. 101-476, § 901, 104 Stat. 1103, 1142. However, since most case law refers to the statute as the EHA, the Court will use this term.
[68] The holding that the Alabama constitution violates plaintiffs' right to due process under the Fourteenth amendment of the United States Constitution is the only holding in this case that does not rely on independent and adequate state constitutional grounds. But whatever the result under federal due process law, this Court has made an independent assessment that plaintiffs are being deprived of their right to due process under the Alabama constitution.
[69] This includes, but is not limited to, all parties who were originally defendants to this lawsuit and their agents, successors and assigns. The Court will take up the issue of possible realignment of parties for remedy purposes at the status conference set herein.